CONNECTICUT STATE EMPLOYEES ASSOCIATION ET AL.
*v.* BOARD OF TRUSTEES OF THE UNIVERSITY OF
CONNECTICUT ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued December 6, 1973—decided January 15, 1974

*John G. Hill, Jr.,* assistant attorney general, with whom, on the brief, was *Robert K. Killian,* attorney general, for the appellants (defendants).

*Jack Rubin,* with whom was *Barry Scheinberg,* for the appellees (plaintiffs).

MacDonald, J. The primary question presented by this appeal is whether the State Personnel Act, chapter 67 of the General Statutes, precludes the board of trustees of the University of Connecticut from entering into a contract with an independent food management contractor, thereby subjecting the 240 classified state employees presently employed in food service operations at the University of Connecticut to the elimination of their positions.

The plaintiffs, the Connecticut State Employees Association (hereafter the CSEA), Chapter 20 of the CSEA, a chartered affiliate of the above-named association consisting exclusively of state employees at the University of Connecticut (hereafter the university), and a group of individual food service employees at the university, brought an action in the Superior Court seeking to enjoin the named defendant and various other state officials from entering into a contract with the Saga Administrative Corporation (hereafter Saga) for the provision of food dispensing service at the university and from dismissing the individual plaintiffs and those similarly situated, claiming that the proposed agreement violated the state civil service law. The court determined the issues for the plaintiffs and issued temporary and permanent injunctions restraining the defendants from taking such action. The defendants have appealed to this court from the judgment rendered.

The defendants have assigned as error (1) the conclusion of the court "that a permanent injunction should issue on the facts found and/or on the evidence," (2) the court's determination that the plaintiffs met their burden of proof to establish the facts of their complaint, in particular the third

count of their complaint,[1] (3) the court's conclusion that a contract for food service by the state is not permissible where the agency retains control over the selection of employees as it did in the proposed contract, (4) the court's failure to rule on the defendants' plea in abatement as to the propriety of the CSEA and Chapter 20 as parties plaintiff, and (5) the court's finding that the proposed contract was not a legal way for the university to contract out its food dispensing service without contravening the merit system.

The court found the following relevant facts, none of which is disputed on this appeal: The food dispensing operation at the university, a state institution, has been and is being served presently by approximately 240 state employees, including all of the individual plaintiffs, who are serving the state under the classified service pursuant to the State Personnel Act. These employees have been so employed for varying lengths of time, ranging from one month to thirty-two years, and all have accrued rights of various kinds resulting from their positions under the state classified service system. The university has provided food service to its student body at least since 1937. On December 15, 1972, however, the board of trustees, by a vote of seven to four, voted to contract out its food dis-

---

[1] The plaintiffs' third count reads, in relevant part: "The proposed agreement between the University of Connecticut and Saga Administrative Corporation . . . has as its basic purpose the dismissal of the Plaintiffs as State employees and the deprivation of their accrued benefits and existing rights as State employees, in violation of the spirit, purpose and intent of the provisions of Title 5 of the General Statutes of Connecticut, while at the same time the University purports to continue to carry out its inherent responsibility to service the food requirements of its student body."

pensing services with Saga. Simultaneously with the signing of the agreement the university intended to give to all the state employees a two-week notice dismissing or laying them off from their positions in the state classified service. In reaching its decision to enter into such a contract the university was carrying out the recommendations of the so-called Etherington Report, the 1971 Report of the Governor's Commission on Services and Expenditures.

The number of students presently availing themselves of the food services involved here is approximately 4500, out of a total student body of approximately 13,000. All of the funds for the operation of the food services come from money collected from the students, there being no state subsidy therefor. The university also has facilities for serving food in a number of dormitories and approximately 3700 students avail themselves of these services. The students themselves operate the food services in the dormitories without any control or regulation as to price, personnel, quality of food or manner of service.

The trial court also made numerous undisputed findings concerning the terms of the proposed contract. To summarize these findings, the contract authorized the contractor to provide food service at the university, but the university retained extensive controls over its operations, including the right to review menus, provide specifications for food, and to approve the credentials and qualifications of management personnel. In the contract Saga agreed to offer employment on a fair trial basis to present state employees.

The defendants' primary assertion is that the plaintiffs failed to meet their burden of proof to establish the facts alleged in their complaint. The gist of this contention is that the plaintiffs had the burden of showing the truth of their allegations, that the proposed action of the board was decided upon in bad faith and "has as its basic purpose the dismissal of the Plaintiffs as State employees and the deprivation of their accrued benefits and existing rights as State employees, in violation of the spirit, purpose and intent of the provisions of Title 5 of the General Statutes" and that they failed to do so. An examination of the State Personnel Act and the statutes relating to the board of trustees convinces us of the merit of this position and we find it dispositive of this appeal.

Section 10-119 of the General Statutes provides that "[t]he board of trustees of the University of Connecticut shall make rules for the government of the university and shall determine the general policies of the university, including those concerning the admission of students and the establishment of schools, colleges, divisions and departments, and shall direct the expenditure of the university's funds within the amounts available."

The statute is clearly written in the broadest possible terms, evincing an obvious legislative intent to clothe the board of trustees with sole jurisdiction over the university in all phases. Section 10-119 grants the board the authority to make rules for the "government" of the university, power to determine the general "policies" thereof, and to "direct" the expenditure of the university's funds. Section 1-1 of the General Statutes provides that "[i]n the

construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language." *State* v. *Benson,* 153 Conn. 209, 214, 214 A.2d 903. Webster's Third New International Dictionary defines "government" as "the act or process of governing: authoritative direction or control." "Policy" is defined as "a definite course or method of action selected (as by a government, . . .) from among alternatives . . . ." "Direct" is a synonym of "administer" and is defined to mean "to guide and supervise: to carry out the organizing, energizing and supervising of, esp[ecially] in an authoritative capacity."

In applying the foregoing definitions to the statute, it becomes evident that the intent of the legislature was to grant to the board the authority to exercise complete direction and restraint over the actions of those connected with the university, including the teaching staff, employees and students. The course of conduct to be followed by all those connected with the university, including those involved in the operation of the food service system, must be as prescribed and set out by the board. Equally clearly, the board has the authority to make "policy" decisions regarding the status of that food service system. The plaintiffs themselves concede that the board could legally cease all operation of its food service program. They maintain, however, that as long as the university is supplying, directly or indirectly, food to its students, it must render that service with state personnel under the classified system. They are, essentially, arguing that, however broad the statutory powers of the board of trustees, they cannot supersede or contravene the requirements of the State Personnel Act. We do

not need to decide that precise question in that we find that the proposed action of the board is not inconsistent with the State Personnel Act.

The plaintiffs place great reliance on § 5-197 of the General Statutes, which states that "[a]ny office or position in the state service, whether full-time or part-time, shall be a position in the classified service, except as hereinafter set forth in this chapter or otherwise specified by statute." The plaintiffs apparently read this to mean that all *services* rendered by the state must be subject to the State Personnel Act. The crucial weakness in this argument, however, is that it ignores the existence of § 5-241 of the General Statutes.

Section 5-241[2] outlines the procedures to be followed when an employee in the classified service is dismissed or laid off because of "lack of work, economy, insufficient appropriation, change in departmental organization, abolition of position." The obvious implication of the statute is that classi-

---

[2] "[General Statutes] Sec. 5-241. ORDER OF LAYOFFS. NOTICE. PLACEMENT ON REEMPLOYMENT LIST. (a) No employee in the classified service who has been performing his duties in a satisfactory manner as shown by the records of the department, agency or institution in which he has been employed shall be dismissed or laid off from his position because of lack of work, economy, insufficient appropriation, change in departmental organization, abolition of position or any cause other than disability, delinquency, incompetency, misconduct or neglect of duty, if any other employee in the same classification performing comparable duties with less state service is to be retained in the same department, agency or institution. For the purposes of this section, the unemployment compensation division may, at the discretion of the labor commissioner, be excluded from the remainder of the labor department and deemed to be a separate agency.

(b) An appointing authority desiring to lay off an employee shall give him not less than two weeks' notice in writing, stating

fied state employees can be dismissed or laid off for those reasons. In *State ex rel. Hartnett* v. *Zeller,* 135 Conn. 438, 65 A.2d 475, this court, in interpreting a predecessor statute of § 5-241, similar in all relevant parts to it, said (pp. 441–42): "There can be no question of the power of the appointing authority to dismiss an employee for such reasons under the broad terms of a statute of this type. To quote one of the many cases so holding, the court in *State ex rel. Buckman* v. *Munson,* 141 Ohio St. 319, 48 N.E. 2d 109, said (p. 326) ' . . . the power to suspend or lay off public officials or employees for reasons of economy is not to be denied notwithstanding statutory or charter provisions to the effect that no employee in the classified service shall be removed except for cause and requiring a statement of reasons for suspension and affording opportunity for explanation and hearing, the view held by all being that such statutory or charter provisions refer to matters of personal conduct of the employee and are not intended to restrict the public authorities in their efforts to effect necessary or *desirable economies.'* See also note, 111 A.L.R. 432." (Emphasis added.)

the reason for such action. A copy of such notice shall immediately be forwarded to the personnel commissioner. The personnel commissioner shall arrange to have the employee transferred to a vacancy in the same or a comparable class or in any other position the employee is qualified to fill in any department, agency or institution. If there is no vacancy available or the employee refuses to accept the transfer, the personnel commissioner shall cause the name of such employee to be placed on the reemployment list for the appropriate class for which he has attained permanent status, or has the ability to qualify, as determined by said commissioner. During the period he is entitled to remain on the reemployment list, such an employee shall be rehired in the classification from which he was laid off, as vacancies occur, in the reverse order of layoff."

In denying a motion for a preliminary injunction in a case strikingly similar to this one, involving the contracting out of the food service department at the University of Connecticut—McCook Hospital by the university board of trustees, the United States District Court for the District of Connecticut took essentially the same position. The court said: "The defendants' [including, among other state officials, the board of trustees] position is that a policy decision was adopted by the University Board of Trustees to contract-out the food service department of the McCook Hospital. Their action eliminated the necessity for similar positions for state employees. While the plaintiffs argue that no jobs were thus actually abolished, such a claim is based on semantics, rather than the facts of reality. Under state law, Connecticut General Statutes, § 5-241, the trustees *had the statutory authority to abolish positions in the state service that were no longer required* (classified or unclassified). Such action must recognize and follow statutory notice procedures and the right to be transferred to an existing vacancy in the same or comparable class, or to another job vacancy for which the employee is qualified, or to have one's name placed on a reemployment list. However, there is no outright guarantee of permanent employment in the state service in a particular job position, which is abolished as provided by statute." (Emphasis added.) *Brown* v. *Meskill,* Civil No. 15362 (D. Conn., Jan. 12, 1973). It appears to us that the board of trustees unquestionably had the right to contract out their food service operation and to eliminate the classified positions therein, provided, of course, that such elimination was for one of the reasons enumerated in § 5-241.

The defendants maintain, and the record amply demonstrates, that the stated reasons for the board's proposed action were economy and efficiency. That reasons of economy were the primary factor is demonstrated further by the court's finding that the board of trustees, in deciding to contract out the food service operation, was carrying out the recommendations of the 1971 Report of the Governor's Commission on Services and Expenditures. "Economy" is one of the reasons specifically mentioned in § 5-241, as noted above. In light of the board's broad authority and § 5-241, there can be no question that the board properly could take the action it contemplated if "economy" were in fact the reason for it.

Moreover, since the board was acting in its official capacity, it is presumed, until the contrary appears, that it acted legally and properly. *State* v. *Lenihan,* 151 Conn. 552, 555, 200 A.2d 476; *Comley ex rel. Brown* v. *Lawlor,* 119 Conn. 155, 161, 174 A. 415; *Atwater* v. *O'Reilly,* 81 Conn. 367, 371, 71 A. 505. The burden of rebutting this presumption and of showing that the board had acted in bad faith, that it had as its basic purpose the dismissal of the plaintiffs as state employees, or that the action was not being taken for reasons of economy thus clearly devolved upon the plaintiffs.

The record is devoid of any indication that the plaintiffs met this burden, nor does the plaintiffs' brief point to any evidence supporting their assertions that the proposed action is a "devious sham," or a "nefarious scheme," or the "initial step in the destruction of the State Civil Service Act." In point of fact, the finding and the evidence printed in

the appendix to the defendants' brief (the plaintiffs printed no appendix), if anything, merely support the defendants' asserted reason of economy.[3]

The plaintiffs also place great reliance on a variety of cases from other states dealing with issues similar to those presented here. These cases, like the case at bar, revolve around interpretations of the applicable civil service laws and other relevant statutes, such as those concerning the powers of the board of trustees herein. Without attempting to distinguish them individually, suffice it to say that the particularization of § 5-241 and the breadth of § 10-119 are controlling on the matter in issue before us, and not the interpretations, by courts of other states, of different, even if similar, statutes.

Since our determination of the single issue discussed above is dispositive of the case, we need not consider the other assignments of error.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the defendants.

In this opinion HOUSE, C. J., SHAPIRO and BOG-DANSKI, Js., concurred; LOISELLE, J., concurred in the result.

---

[3] The evidence printed in the appendix to the defendants' brief reveals that the question of a food service contract was referred to a subcommittee of the board of trustees for study and recommendation. After an extensive investigation the subcommittee presented a detailed report to the entire board with the recommendation that, for reasons of economy of operation and efficiency, as well as employee protection, food services should be contracted out to Saga. This evidence and the finding of the court that the proposed contractual arrangement was prompted by the 1971 Report of the Governor's Commission on Services and Expenditures are the only indications in the record or in the briefs as to the reasons for the proposed action.