UNIVERSITY OF NEVADA AND FRED M. ANDERSON, LOUIS E. LOMBARDI, JAMES L. BUCHANAN, II, PAUL D. McDERMOTT, WILLIAM W. MORRIS, HELEN THOMPSON, FLORA DUNGAN, HAROLD J. JACOBSEN AND MEL STENINGER, THE BOARD OF REGENTS OF THE UNIVERSITY OF NEVADA, APPELLANTS, v. STATE OF NEVADA EMPLOYEES ASSOCIATION, INC., A NEVADA CORPORATION, AND GILBERT A. VELARDE, EUGENE HILL, JOSE I. MAESTAS, MARIE ELSPETH SCHULT, JESSIE DAY, HARRISON TAYLOR, KENNETH L. STREET, CHRISTOPHER STONE McKENNEY, CARRIE ETHEL CLARK, JERYL DEAN JESSOP, BARBARA SUE SEAL, CORDELIA P. TATUM, LUCILLE D. CAFFARATTI, ALICE L. BENEVIDES, FLORENCE B. RIDGE, MARGARET G. TODD, IRENE FRANCES POSCH, LUCINDA MARIE HARRIS, MERLE HORTENSE NORTON, MARY FRANCES RAYHILL, GEORGIA ELDORA RECAMI, SVEND D. PETERSEN, FERN ESTELLA HUTTON, THELMA GEORGIA OREBUCK, KARL ROBERT BURKHART, CHRISTOPHER DEAN PEIRCE, INEZ JULIA BONI, EILEEN BROWN, SYDNEY MOISANT, MAUDIE D. BEERS AND MARY DOROTHY KUNSCH, RESPONDENTS.

No. 7460

March 26, 1974                    520 P.2d 602

*Robert List,* Attorney General, Carson City, and *Procter Hug, Jr.,* Special Deputy Attorney General, Reno, for Appellants.

*Sanford, Sanford, Fahrenkopf & Mousel,* of Reno, for Respondents.

## OPINION

By the Court, GUNDERSON, J.:
In this action instituted by 31 classified state civil service

employees and their bargaining agent, the district court permanently enjoined the University of Nevada and its Board of Regents from contracting for food service at the University's Reno campus with anyone except classified state employees, and from laying off classified employees in order to obtain food service from anyone else. On appeal, the University and Regents contend that in the circumstances prevailing, they lawfully may terminate the existing state-managed food service, lay off its classified employees, and thenceforth obtain meals through a private contractor. Having reviewed the record, consisting of unchallenged documentary evidence and stipulations of fact, we agree.

The food service is evidently intended to be self-sustaining; the Legislature appropriates no subsidy; dormitory residents remit lump-sum fees each semester; guests and faculty pay per meal. On the University's Las Vegas campus, food service has always been obtained through an independent contractor, without deficit. However, at Reno, the state-managed food service has for several years incurred an increasing deficit, exceeding $220,000 for fiscal 1972–73. Thus, the Regents ultimately felt constrained to consider eliminating these deficits by increasing student fees, or by organizational changes.

To study alternatives, a joint student-administration committee was created, which suggested abolishing the existing food service, and purchasing meals as in Las Vegas, from a private entity bearing the risk of profit or loss. The President of the University of Nevada, Reno, with the concurrence of the Chancellor, recommended this plan to the Board of Regents, which approved it. Accordingly, the University negotiated a contract to obtain prepared meals through a private contractor at agreed prices, relying on a state personnel law which declares that "institutions may contract for the services of persons as independent contractors." NRS 284.173(1). Then, on May 29, 1973, the University notified food service employees at the Reno campus that effective June 30 they would be laid off, subject to civil service bumping and reemployment rights. Appellants predicated these layoffs on another personnel statute which provides that "an appointing authority may lay off an employee in the classified service whenever he deems it necessary by reason of shortage of work or funds or the abolition of a position or of other material changes in duties or organization." NRS 284.380(1).[1]

On June 18, respondents brought this action, contending the

---

[1]To assure its workers their civil service reemployment preferences, the University contacted other state agencies, and before the scheduled

contemplated layoffs would derogate civil service principles embodied in NRS Chapter 284 as a whole, and the district court agreed.[2] On appeal, the University and Regents urge *inter alia* that, as the district court applied it, NRS Chapter 284 infringes the Regents' constitutional right and duty to "control and manage the affairs of the University and the funds of the same." Nev. Const. art. XI, § 7; see also, art. XI, § 4; cf. King v. Board of Regents, 65 Nev. 533, 200 P.2d 221 (1948). Without reaching constitutional arguments, we reverse the district court, holding that on the facts disclosed by the record, appellants' actions do not appear to violate either the letter or the spirit of Nevada's merit system laws, as contained in NRS Chapter 284.

1.   Respondents contend that, despite good faith and superficial conformity with NRS 284.173(1) and NRS 284.380(1), a "functional analysis" shows that appellants' plan is tantamount to a sham abolition of established civil service positions, merely supplanting classified employees with outside personnel. In this regard, respondents rely on City of Phoenix v. Powers, 113 P.2d 353 (Ariz. 1941), and Winslow v. Bull, 275 P. 974 (Cal.App. 1929), in which civil servants were ousted by "abolishing" their positions and designating others to perform substantially the same duties under different titles. In each case, although the appointing authority claimed to have acted for reasons of economy, the court found otherwise, holding no actual abolition of the position had occurred, and intimating that the appointing authority was really merely circumventing the civil service laws. The courts ordered the original incumbents reinstated.

On their facts, these decisions appear sound. Moreover, we agree with respondents that mere good intentions, good will, or "good faith" on appellants' part cannot justify supplanting

layoff date had arranged transfers for 15 of the 31 affected employees, all but one at the same pay-rate and classification. Several other employees received offers, but would not discuss reemployment. Those not offered new jobs had relatively little time in classified service.

[2]Concerning the general intent of NRS Chapter 284, the statutory provisions considered most significant by respondents and the district court recognize the goal that personnel in classified state service shall be employed on the basis of merit and fitness. See, for example: NRS 284.010; NRS 284.150; NRS 284.205; NRS 284.280.

In its written Decision, the district court said, *inter alia,* that NRS Chapter 284 was offended·because ·"the claimed 'reorganization' was purely and simply the 'replacement' of civil servants by independent personnel in positions which were in no sense of the word abolished."

permanent civil service employees through a reorganization functionally equivalent to a sham abolition of existing positions.[3] Still, in this case, we cannot agree that appellants' reorganization plan is functionally a mere sham abolition of existing positions.

After all, we cannot assume that the private contractor's methods of operation will duplicate those the University has utilized. Apparently, it is expected that the contractor's expert approach will be quite different; for merely eliminating civil service status for employees could not, of itself, correct a deficit now approaching $1/4 million per year. Except for requiring that students be employed as needed for certain unskilled work, the contemplated agreement affords the contractor a free choice of methods. It may select new material sources, use its own buying techniques, utilize its own inventory and accounting procedures, and provide greater or less supervision for employees different in training, function and number from those now employed. In short, the agreement does not envision that the contractor will merely supply services of substantially the same kind as those now provided by classified personnel. Instead, the contractor is to supply prepared meals, at stipulated prices, meeting its own material costs, management salaries, employees' wages, industrial and liability insurance premiums, and other expenses.

Thus, in our view, a "functional analysis" does not establish appellants' contemplated actions to be equivalent to a sham abolition of the existing positions.

2. We would agree, however, that even a good faith, actual abolition of classified positions may be unlawful if done

[3] Rather than speaking in terms of a "functional analysis," some authorities have said that "good faith" in such a case is not a question of fact but one of law. H. Elliot Kaplan, Adjunct Professor of Public Administration, New York University, who long was Executive Director and General Counsel to the National Civil Service League, has said:

". . . Most courts have held that the issue of good faith on the part of an administrative official is one of law solely for the court to pass on, and not an issue of fact which may be submitted to a jury for determination. . . . As a general rule, where positions are purported to be eliminated and incumbents laid off, and thereafter identical or similar positions are re-established and the positions filled by others not entitled under the civil service law and rules to such employments, the courts will not hesitate to order re-employment of the laid off employees." H. Kaplan, *The Law of Civil Service,* 214–215 (1958).

Whatever vocabulary is employed to express the thought, it seems clear that a public employee's rights should not turn on whether his ouster was undertaken with good or evil motives.

without a sufficient, legally cognizable reason. This point may be illustrated by contrasting the case on which respondents rely most heavily, Cunningham v. Community College District No. 3, 489 P.2d 891 (Wash. 1971), with three that approve layoff of civil servants and subsequent utilization of a private contractor.

In the *Cunningham* case, college authorities decided to lay off civil servants, and to engage a private contractor, because they considered their existing staff inadequate to expand an already profitable food service operation. The employees challenged these actions under a rule that authorized layoffs only "because of lack of funds or curtailment of work." Focusing on this language, the Washington Supreme Court determined from the record that no data existed to show lack of funds. Work was being expanded, not curtailed. Thus, the court held the layoffs unlawful, saying:

"We recognize that the trustees of institutions of higher education are charged with the primary duty of providing the best possible education at a reasonable cost. But, in the area of personnel, the [civil service law] is the statutory scheme within which their responsibility must be fulfilled." *Id.* at 897.

Although we cannot fault this reasoning, we must measure the facts of our own case against the layoff provisions in our own merit system laws. In this regard, one might argue that the record before us shows "shortage of funds" within the meaning of NRS 284.380(1), but since appellants have not done so, we look to other grounds for layoffs set forth in that statute, to wit: "abolition of a position or of other material changes in duties or organization." In essence, appellants contend that an appointing authority comes within this legislative authorization if it acts in good faith to effect an actual abolition of positions, in a true and not fundamentally sham reorganization. We agree, provided it does not appear that the authority is acting arbitrarily, capriciously, or for insubstantial reasons.

Corwin v. Farrell, 100 N.E.2d 135 (N.Y. 1951), is the judicial precedent decided upon facts we consider most analogous to those before us, and which best articulates our views. Therein, the New York Court of Appeals approved abolishing an uneconomic government-operated title department to enter a contract with a private abstract company, saying:

"Under the circumstances here presented, . . . we are of the view that the Authority's action here was within its power, that it was not exercised in bad faith, arbitrarily or capriciously, nor in an attempt to evade the civil service laws. It has

not appointed individuals in the places of those dismissed but, because of the unusual situation it faced, to which we have already adverted, it entered into a normal modern business practice of purchasing abstracts and certifications of title at a fixed price. The Authority does not select, control or even approve the officers or employees of the contractor; does not fix their compensation or their hours of work; does not engage them exclusively nor restrict them from engaging in their regular business with anyone they choose; there is no employer-employee relationship whatever; and these contracts do not constitute an 'appointment' in the civil service.

"This is not to say that any type of service performed by civil service employees may be contracted to private firms, and where such contracts are employed as a scheme to oust civil service' employees simply to make room for others, or to mask a true employment relationship, or to circumvent the civil service laws, even if not made in bad faith, we shall not hesitate to strike them down. . . ." *Id*. at 139.

These views, we think, would impel the same result as the Washington court reached in the *Cunningham* case, wherein the record showed that no substantial reason to supplant classified personnel existed. Such views also seem compatible with those the Maryland Court of Appeals expressed in Ball v. Board of Trustees of State Colleges, 248 A.2d 650 (Md. 1968), when approving termination of a state-managed food service: "Authorities universally affirm the proposition that the executive departments of government may lay off a merit system employee by abolishing the position which he holds, with the limitation that it be for a bona fide reason and not a subterfuge to evade the merit system laws." *Id*. at 654. To us, it is significant that the court spoke not merely of "good faith," but of a "bona fide *reason*," which we take to mean a substantial and legally cognizable reason.

Of course, most states presume the regularity of official action. See: NRS 47.250(9). Therefore, persons challenging the abolition of classified positions must make it appear that the action is in bad faith, fundamentally a sham, or is undertaken arbitrarily, capriciously or for insubstantial reasons. Accordingly, in Connecticut State Employees Association v. Board of Trustees (Conn. 1974), a university's trustees terminated a state-managed food service to obtain meals through a private contractor. The Connecticut Supreme Court upheld the trustees, noting that the record indicated they were acting for reasons cognizable under Connecticut's layoff statute, and observing: "Moreover, since the board was acting in its official

capacity, it is presumed, until the contrary appears, that it acted legally and properly. [Citing authorities.] The burden of rebutting this presumption . . . thus clearly devolved upon the plaintiffs."

3. In summary, then, NRS 284.380(1) and NRS 284.173(1) do not combine to afford an absolute alternative to Nevada's civil service system. We reject any suggestion that "good faith" alone will justify substituting a private contractor for an existing and stable state-operated service. To the contrary, we believe that under NRS Chapter 284 an appointing authority may not abolish civil service positions and obtain substitute services through a private contractor, unless it not only acts in good faith, to effect a real and not fundamentally sham reorganization, but also for substantial rather than arbitrary and capricious reasons. Moreover, we believe that the substantiality of reasons motivating such a substitution must be considered in context with the ideals and goals of NRS Chapter 284, and that therefore no such action can be justified by reference to supposed advantages derived from eliminating tangible or intangible emoluments which Nevada law intends classified state employees to have.

Notwithstanding all this, we believe the record before us fails to show that appellants have offended these criteria, and instead it shows that they have proceeded in absolute good faith, upon mature deliberation, for highly substantial if not compelling reasons, and with respect for their employees' legal rights and personal well-being. Therefore, the judgment of the district court is reversed, without costs.

THOMPSON, C. J., and MOWBRAY, BATJER, and ZENOFF, JJ., concur.