854 So.2d 322 (2003)
CIVIL SERVICE COMMISSION OF the CITY OF NEW ORLEANS
v.
The CITY OF NEW ORLEANS.
Nos. 2002-C-1812, 2002-C-1815.
Supreme Court of Louisiana.
September 9, 2003.
*324 Loretta G. Mince, James R. Swanson, Joseph C. Peiffer, Correro, Fishman, Haygood Phelps & Weiss, New Orleans, Counsel for Applicant (No. 2002-C-1815).
Gilbert R. Buras, Jr., Metairie, Charles L. Rice, City Attorney, Franz L. Zibilich, Sherry L. Landry, Joseph V. DiRosa, Jr., Michael E. Botnick, New Orleans, Counsel for Respondent (No. 2002-C-1815).
Scott R. Bickford, Elwood Francis Xavier Cahill, Jr., Donna DiMarino Fraiche, David A. Marcello, Richard C. Stanley, Randall A. Smith, Harry A. Rosenberg, James M. Garner, New Orleans, Counsel for The Business Council (Amicus Curiae).
Marian M. Berkett, New Orleans, Counsel for Louisiana Civil Service League (Amicus Curiae).
*325 Robert R. Boland, Jr., Counsel for State Civil Service Commission (Amicus Curiae).
Charles L. Rice, Jr., City Attorney, Franz L. Zibilich, Sherry L. Landry, Joseph V. DiRosa, Jr., Michael E. Botnick, New Orleans, Counsel for Applicant (No. 2002-C-1812).
Gilbert R. Buras, Jr., Metairie, Loretta G. Mince, James R. Swanson, Joseph C. Peiffer, Correro, Fishman, Haygood Phelps & Weiss, New Orleans, Counsel for Respondent (No. 2002-C-1812).
VICTORY, J.
We granted this writ to determine whether rules promulgated by the New Orleans Civil Service Commission (the "Commission"), which require that privatization [1] contracts entered into by the City must be reviewed and approved by the Commission prior to their implementation, are a constitutional exercise of the Commission's rulemaking authority under La. Const. Art. X, § 10.

FACTS AND PROCEDURAL HISTORY
On July 1, 1999, the City of New Orleans (the "City") published a Request for Proposals ("RFP") for operation of the New Orleans Cultural Center (the "Cultural Center"), which includes the city-owned Morris F.X. Jeff Municipal Auditorium and the Mahalia Jackson Theater of Performing Arts. Under City management, the Cultural Center operated at large annual deficits to the City; for example, in 1999, a $915,000.00 deficit was attributable to the Cultural Center. Thus, in order to reduce the annual deficits, the City issued the RFP seeking bids from professional entertainment venue managers specializing in this type of entertainment complex. SMG Crystal, LLC ("SMG"), an international theater and arena management company which operates, among other facilities, the state-owned Superdome, the adjacent New Orleans Arena, and the City of Baton Rouge Centroplex, was awarded the contract on September 8, 2000, to become effective on October 1, 2000, for a period of ten years (the "Agreement"). The Agreement requires SMG to expend $25,000.00 annually to market and promote the Cultural Center, and, in consideration for its services, the Agreement requires the City to pay SMG an annual fee of $175,000.00, plus an incentive fee based on the amount by which SMG reduces the operating deficit.
Prior to the Agreement, the Cultural Center was operated by the Department of Property Management and employed 19 classified civil service employees. Following the Agreement, each of the 19 civil servants previously assigned to the Cultural Center were offered lateral transfers with the Department of Property Management: ten of these civil servants were offered, and accepted, positions of employment with SMG and resigned from City employment. The remaining nine remain employed by the City within the Department of Property Management at the same pay rate.
After SMG took over the operation of the Cultural Center, the Commission filed suit in Civil District Court, alleging that the Agreement was entered into in violation of its rules which require that the City *326 obtain the Commission's approval prior to privatizing any governmental function. The Commission sought a permanent injunction, declaring the Agreement void ab initio and prohibiting its implementation until such time as the Agreement had been submitted to and approved by the Commission. In response, the City challenged the constitutionality of the Commission's rules on the grounds that the Commission overreached its authority in enacting rules that extend beyond the scope of its constitutionally granted powers.
Following a hearing, the trial court entered judgment on December 8, 2000, enjoining: (a) the City from (1) transferring any employee employed at the Cultural Center, absent Commission approval, until such time as the Commission has approved the Agreement and (2) executing any other contracts for services to be performed at or for the Cultural Center during the pendency of this action without the Commission's approval; and (b) SMG from discharging any SMG employee formerly employed by the City, absent Commission approval, until such time as the Commission has approved the Agreement. The City and SMG appealed to the Fourth Circuit Court of Appeal, which affirmed the district court judgment in a 2-1 decision. Civil Serv. Comm'n of New Orleans v. City of New Orleans, 01-0635 (La.App. 4 Cir. 4/10/02), 826 So.2d 23. We granted writ applications to consider whether the Commission's rules are a constitutional exercise of its rulemaking authority under Art. X, § 10 of the Louisiana Constitution. Civil Serv. Comm'n of New Orleans v. City of New Orleans, 02-1812 c/w 02-1815 (La.11/1/02), 828 So.2d 581.

DISCUSSION

The City's Powers as a Home Rule Government
Under New Orleans' Home Rule Charter, the power to make budgetary decisions is shared between the mayor and the city council. City of New Orleans, Home Rule Charter, Art. III, §§ 3-1153-119; Art. IV, §§ 4-206(1)(f)-(g), 4-302(6). The Home Rule Charter gives the mayor and city council authority to contract for professional services through competitive selection procedures, which are fixed separately by Mayoral Executive Order for the executive branch of government and by Council Rule for contracts let by the legislative branch of city government. City of New Orleans, Home Rule Charter, Art. IV, § 4-1401; Art. VI, § 6-308. Necessarily, fiscal decisions within the City's domain include decisions affecting classified employees. For instance, the City has the unrestricted authority to lay off civil servants for budgetary reasons, with the Commission playing only a ministerial role in administering the layoffs in accordance with certain constitutionally based preferences for civil servants who are veterans. La. Const. Art. X, Part I, § 10(A)(3).
In considering the City's authority, it is well settled that the state's political branches retain plenary authority to do all things not expressly forbidden by the Constitution. Louisiana Dep't of Agric. & Forestry v. Sumrall, 98-1587 (La.3/2/99), 728 So.2d 1254, 1259. Pursuant to Article VI of the Constitution, a municipal authority governed by a home rule charter possesses powers, in affairs of local concern within its jurisdiction, that are as broad as those of the state, except when limited by the Constitution, laws permitted by the Constitution or its own home rule charter. La. Const. Art. VI, §§ 4-5; Francis v. Morial, 455 So.2d 1168, 1171 (La.1984). Article VI, Section 6 of the Constitution expressly prohibits legislative interference in the powers of a municipal authority *327 governed by a home rule charter.[2] These constitutional grants of authority to home rule bodies were intended to prevent the legislature from substituting its judgment for that of the home rule government with respect to the arrangement of the various offices, departments, and agencies of the local government and the assignment, allocation or distribution of purposes, work, authority, and capacities among and within such offices, departments, and agencies. Francis, 455 So.2d at 1171. "Unless the Constitution elsewhere provides express authority for such an intrusion, any state law that changes or affects, i.e., produces an alteration in or material influence upon, the local government's structure and organization or the distribution of its powers and functions is prohibited." Id. at 1171-72. "[H]ome rule abilities and immunities are to be broadly construed, and any claimed exception to them must be given careful scrutiny by the courts." City of New Orleans v. Board of Comm'rs, 93-0690 (La.7/5/94), 640 So.2d 237, 243.
The City urges that in evaluating the City's revenues and budgetary needs, the mayor and council have a right and a duty to determine and expeditiously implement the most efficient and economical modes of delivery of public services, even if the mayor and council determine that a particular governmental function could best be delivered through an independent contractor, rather than through civil servants. Thus, the City argues that once the duly elected officials have deemed the privatization of a governmental function to be fiscally imperative, the Commission may not infringe upon the governing authority's constitutionally protected right to enter into a contract with an independent contractor for the provision of such services.

The Objectives and Powers of the Civil Service Commission
The Louisiana Constitution establishes a "city civil service" that includes "all persons holding offices and positions of trust or employment in the employ of each city having over four hundred thousand population." La. Const. Art. X, Part I, § 1(B). "Civil service is designed to abrogate the `spoils system' under which public employees are not selected for employment and promotion on the basis of merit or qualifications for the position but as rewards for faithful political activity and service, so that the job holders and their families become economic slaves of a particular political organization and have to vote and work for the candidates of their faction regardless of the character or qualifications of the candidates." New Orleans Firefighters Ass'n v. Civil Service Comm'n, 422 So.2d 402, 410 (La.1982) ("Firefighters I") (citing 3 C.E. Dunbar, Jr., Projet of a Constitution for State of Louisiana 500 (1954)). Because of the tumultuous history of civil service in Louisiana,[3] detailed provisions on civil service *328 are included in our constitution so that the merit system can be repealed or amended only by a vote of the people, to protect against "repeal or weakening amendments and sabotage by a temporary majority vote of a spoils-minded and partisan legislative faction." Id.
Thus, the prime objectives and purposes of the constitutionally created civil service system are to ensure that non-policymaking, i.e., "classified," city employees are (1) competitively selected on the basis of merit, free from political influence, and (2) protected from discriminatory dismissal or treatment for religious or political reasons. New Orleans Firefighters Ass'n Local 632 v. New Orleans, 590 So.2d 1172, 1175 (La.1991) ("Firefighters II") (citing 3 Projet of a Constitution for the State of Louisiana, 504 (1954)).
The Commission's rulemaking powers in that regard are provided in the Constitution as follows:
Each commission is vested with broad and general rulemaking and subpoena powers for the administration and regulation of the classified service, including the power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation... to employees, and other personnel matters and transactions; to adopt a uniform ... classification plan; ... and generally to accomplish the objectives and purposes of the merit system of civil service as herein established.
La. Const. Art. X, Part I, § 10(A)(1). Rules adopted by the Commission have the effect of law. Firefighters II, supra at 1175; Louisiana Civil Service League v. Forbes, 258 La. 390, 246 So.2d 800 (1971). "Thus, a city civil service commission has the exclusive power to adopt rules regulating the classified service in the areas specifically enumerated in Section 10(A)(1), and the city governing authority cannot constitutionally infringe on the commission's exercise of this power." Firefighters II, supra at 1175. "Moreover, the convention debates surrounding the adoption of Section 10(A)(1) indicated an intent that this provision should be construed *329 liberally in favor of fulfilling the goals of civil service." Id.
In 1988, pursuant to Art. X, § 10(A)(1), the Commission adopted Rule III, Sections 6.1 through 6.4, in force at the time the Agreement was entered into, which states, in pertinent part:
6.1 All contracts for personal and professional services, and amendments thereto, shall be reviewed and approved by the Director well in advance of their effective dates to insure compliance with the Civil Service Law and to determine whether such services should be provided within the classified service. Such contracts shall become effective only when approved by the Director. When so approved, they may thereafter continue for a period not to exceed one (1) year from the effective date of the contract.
6.2 Contracts for personal or professional services ... shall be approved only when such services require unique or specialized skills not presently required of positions in the classified service...
6.3 All contracts for personal or professional services ... first shall be transmitted to the Civil Service Department for initial consideration and review, and again for final approval after all other aspects of contractual review have been completed ...
6.4 The prior provisions of this Rule notwithstanding, if due to fiscal restraints or some other cause it becomes necessary to privatize either a traditional governmental function or one unique to the City which has been performed by classified employees, or to privatize an existing or newly established organization unit of city government which is or could be staffed by classified city employees, no action or decision toward this end by any agency of the City, State, or Parish of Orleans shall become binding and effective until approved by the City Civil Service Commission, subject to the following conditions:
(a) Any contract for privatization of a governmental service shall contain a provision that thoroughly explains the effects of privatization on the status of current employees, as well as any specific contractual commitments entered into by the parties, which affect the interests of the displaced employees.
(b) Any contract for privatization of a governmental service shall contain an additional provision which has the effect of prohibiting unlawful discriminatory treatment of employees.
(c) Any contract for privatization of a governmental service shall contain an additional provision which affords regular employees an opportunity for a full and fair hearing prior to any disciplinary action.
(d) Employees who choose to remain in the classified service of the City may request the City Civil Service Commission to invoke the application of Rule XII, Layoffs, in order to preserve their classified status.
(e) Commission approval of a contract for privatization shall be effective only for the term of the contract actually reviewed.
(f) A copy of the proposed contract, and such other evidence to be presented to the Commission to justify the necessity for privatization, shall be reviewed with the Commission at a public meeting. The Commission shall not approve the contract prior to a subsequent meeting, with due notice given to the public of the proposed provisions of the privatization contract. Due notice shall include individual *330 notification to affected employees.[4]
The court of appeal found that these rules are squarely within the constitutional authority granted to the Commission in that they relate to the selection, hiring, promotion, demotion, suspension, and removal of public employees. 826 So.2d at 30. The City and SMG argue that the court of appeal erred in holding that the Commission's privatization rules are within the scope of the Commission's constitutional authority.

Analysis
As stated above, pursuant to Article VI of the Constitution, a municipal authority governed by a home rule charter possesses powers, in affairs of local concern within its jurisdiction, that are as broad as those of the state, except when limited by the Constitution, laws permitted by the Constitution, or its own home rule charter. La. Const. Art. VI, §§ 4-5; Francis v. Morial, supra at 1171. Thus, the issue here is whether Rule III, Secs. 6.1-6.4, under which the Commission claims its authority to review and approve privatization contracts entered into by the mayor, are laws permitted by the Constitution.
This Court has developed a two-part test for determining whether rules enacted by the Commission are within the Commission's constitutional authority:
In evaluating the constitutionality of Commission rules, this Court has applied the two-part analysis developed in [Firefighters I] and [Firefighters II ], and reaffirmed by this Court in Police Ass'n of New Orleans v. City of New Orleans, 94-1078 (La.1/17/95), 649 So.2d 951, 959. In the Firefighters II case, we described the authority granted to state and city commissions under Article X, Section 10(A)(1) as the "exclusive power to adopt rules regulating the classified service in the areas specifically enumerated in Section 10(A)(1)." [Firefighters II], 590 So.2d at 1176 (emphasis added). Thus, our initial inquiry when evaluating the Commission's authority to enact a rule is whether the rule in question falls within an area specifically enumerated in Article X, Section 10(A)(1).
"However, in areas of power affecting public employees which are not enumerated in Section 10(A)(1), a commission's powers should not be expanded beyond those necessary to effectuate the objectives and purposes of the civil service." [Firefighters II], 590 So.2d at 1176 (citing [Firefighters I], 422 So.2d at 411) (emphasis added). "Thus, if the Commission has adopted a rule in an area not specifically enumerated in Section 10(A)(1), a court must ask whether it is necessary for the commission to have the power to enact the rules in question to effectuate the objectives and purposes of the civil service." Id.

Sumrall, supra at 1261.
Thus, we first must determine whether the power to make rules concerning the approval of contracts to manage and operate City facilities is specifically enumerated by Art. X, § 10(A)(1) of the Constitution. As with statutory interpretation, "when interpreting a constitutional provision, the starting point is with the language of the provision." Id. at 1258. Further, when "a constitutional provision is plain and unambiguous, its language must be given effect." Id.
*331 As noted above, the constitutional provision governing this case is Article X, § 10(A)(1) which vests the Commission with:
broad and general rulemaking and subpoena powers for the administration and regulation of the classified service, including the power to adopt rules for regulating employment, promotion, demotion, suspension, reduction in pay, removal, certification, qualifications, political activities, employment conditions, compensation and disbursements to employees, and other personnel matters.
Here, the Commission has adopted rules which require that all contracts for personal or professional services and all privatization contracts be submitted to the Commission for their review and approval. The Commission's rules governing the approval of the City's contracts do not appear to have anything whatsoever to do with "reduction in pay," "certification," "qualifications," "political activities," "employment conditions," "compensation," or "disbursements" as those terms have been defined.[5] Therefore, the question is whether the Commission is authorized to make these rules under the Commission's powers to regulate civil service "employment," "promotion," "demotion," "suspension," "removal," or "other personnel matters." This Court has defined those terms as follows:
(1) "employment" refers in context to the selection and hiring of employees;
(2) "promotion" and "demotion" refer to the raising or lowering in position of employees after employment;
(3) "suspension" refers to the temporary removal of a public employee from service;
(4) "removal" refers to the permanent separation from employment; and
(5) "other personnel matters" allows the Commission some flexibility in rulemaking with respect to administration of personnel.
Firefighters II, 590 So.2d at 1173; Sumrall, 728 So.2d at 1262. In a privatization contract, the only possible effect on civil service employees would be their "removal" from civil service. However, this Court has twice previously held that the City, not the Commission, has the power to make rules that incidentally affect "employment" of classified workers and even result in their "removal," where the ability to make such rules are not a part of the Commission's constitutionally enumerated powers. For instance, in Firefighters II, the City enacted an ordinance that required classified workers to be domiciled in Orleans Parish. The ordinance authorized the "removal of a public employee who violates" the residency requirement. The Commission challenged the ordinance claiming it intruded on the Commission's ability to regulate "employment" and "removal" of classified workers. This Court disagreed with the Commission and upheld the ordinance, finding that the ordinance did not fall under the Commission's ability to regulate the "removal" of classified employees *332 in that a "commission's power to regulate removal deals more with fairness and procedural safeguards in the removal process" and that the right to regulate removal speaks more to "the prohibition against subjecting a permanent employee to disciplinary action except for cause." Firefighters II, supra at 1176.
This Court reaffirmed its holding in Firefighters II a few years later in Police Association, 649 So.2d at 960. In Police Association, the City passed an ordinance that allowed policemen to live outside of New Orleans, but required policemen to move into the city to be eligible for a promotion. This Court was again called upon to decide whether it was the City or the Commission that had the power to impose this requirement. The plaintiffs argued, and the appeals court held, that Firefighters II "pertained only to domicile requirements as related to initial employment and not to promotions ..." See id. at 958. This Court reversed, holding that Firefighters II "goes beyond dealing with initial employment" and the opinion analyzed "the effect of the domicile requirement not only on initial employment, but on promotion, suspension, removal, political activities, etc., holding that the domicile requirement did not impinge on any of these functions and powers of the Civil Service Commission." Id. at 958-59.
In this case, SMG and the City argue that no classified civil servants were even "removed" from employment under the Agreement, and therefore, the Commission has no review power over the Agreement at all.[6] Further, even if one or more classified employees were displaced as a result of a privatization contract, such displacement would be more akin to a "layoff" that to a "removal." Under Art. X, § 10(A)(3), the Commission does not have the power to regulate when a layoff can occur, but can only regulate the administration of the layoff. Art. X, § 10(A)(3) provides in pertinent part: "When a position in the classified service is abolished, or needs to be vacated because of stoppage of work from lack of funds or other causes, preference employees ... whose length of service and efficiency ratings are at least equal to those of other competing employees shall be retained in preference to all other competing employees." The City and SMG argue that this decision by the framers of the Constitution not to grant the Commission the power to prevent, affect, or even to review proposed layoffs is significant because there is no greater action that can affect the classified service employees than layoffs.
We find no specific language under Art. 10, Sec. 10(A)(1) which gives the Commission the power to make rules concerning the approval of contracts to manage and operate City facilities. We must now consider whether it is necessary for the Commission to have the power to enact the rules in question to effectuate the objectives and purposes of the civil service.
As noted above, the primary objectives and purposes of the civil service system are to (1) ensure that classified employees are competitively selected on the basis of merit, free from political influence, and (2) protect classified employees from dismissal or disciplinary actions for religious or politically motivated reasons. The issue here is whether it is necessary for the Commission to enact rules requiring its review and approval of all privatization contracts in order to accomplish these objectives.
In making this determination, we recognize that there is a delicate balance to be reached between the Commission's duty to protect against the spoils system, either by privatization or otherwise, and the mayor's *333 power and authority to operate the city in a fiscally responsible manner and to enter into contracts to fulfill that duty. Although res nova in this Court, many state supreme courts have addressed the issue of whether the privatization of governmental functions through the use of independent contractors runs afoul of constitutionally created civil service systems. Certain courts have held that privatization by a governmental entity does not necessarily violate the state civil service system, although these courts did not determine the circumstances under which private contracts were acceptable. See Moore v. State, Dept. Of Transp. and Public Facilities, 875 P.2d 765 (Alaska 1994); Maryland Classified Employees Ass'n, Inc. v. State, 346 Md. 1, 694 A.2d 937 (1997); Smith v. Board of Comm'rs of Hall County, 244 Ga. 133, 259 S.E.2d 74, 80 (1979) (holding that merit system does not prohibit governing authority from discontinuing a department of county government in the best interest of serving the public); Haub v. Montgomery County, 353 Md. 448, 727 A.2d 369, 378 (1999) (finding its conclusion that the privatization of civil service positions does not violate civil service protections to be "[i]n accord with the clear majority of cases throughout the country, ... that general provisions establishing a merit system for government employees... [do not] preclude the government from privatizing"). Other states have taken the position that privatization may be undertaken only pursuant to specific authorization. See Colorado Ass'n of Public Employees v. Department of Highways, 809 P.2d 988 (Colo.1991); Horrell v. Department of Admin., 861 P.2d 1194 (Colo.1993); Vermont State Employees' Ass'n, Inc. v. Vermont Criminal Justice Training Council, 167 Vt. 191, 704 A.2d 769 (1997). Some courts have held that services customarily and historically provided by civil servants may not be contracted out to private parties, at least so long as civil servants are able to provide the services sought to be contracted out. Konno v. County of Hawai'i, 85 Hawai'i 61, 937 P.2d 397 (1997); Washington Federation of State Emp., AFL-CIO, Council 28 v. Spokane Community College, 90 Wash.2d 698, 585 P.2d 474 (1978). California courts have held that the government is not permitted to privatize services that are adequately and competently provided by civil servants, State Compensation Ins. Fund. v. Riley, 9 Cal.2d 126, 69 P.2d 985 (1937); Burum v. State Compensation Ins. Fund, 30 Cal.2d 575, 184 P.2d 505 (1947); California State Employees' Assn. v. State of California, 199 Cal.App.3d 840, 245 Cal. Rptr. 232 (1988); Department of Transportation v. Chavez, 7 Cal.App.4th 407, 9 Cal.Rptr.2d 176 (1992), but have created an exception for new state services. California State Employees' Assn. v. Williams, 7 Cal.App.3d 390, 86 Cal.Rptr. 305 (1970). Some courts have held that, under the civil service system, a governmental entity is permitted to enter into a private contract, or lay off or abolish the positions of civil servants in order to enter into a private contract, only in good faith. Connecticut State Employees Ass'n v. Board of Trustees of University of Connecticut, 165 Conn. 757, 345 A.2d 36 (1974); Ball v. Board of Trustees of State Colleges, 251 Md. 685, 248 A.2d 650 (1968); Michigan State Employees Ass'n v. Civil Service Com'n, 141 Mich.App. 288, 367 N.W.2d 850 (1985); University of Nevada v. State Emp. Ass'n, Inc., 90 Nev. 105, 520 P.2d 602 (1974); Local 195, IFPTE, AFL-CIO v. State, 88 N.J. 393, 443 A.2d 187 (1982); Corwin v. Farrell, 303 N.Y. 61, 100 N.E.2d 135 (1951); State ex rel. Sigall v. Aetna Cleaning Contractors of Cleveland, Inc., 45 Ohio St.2d 308, 345 N.E.2d 61 (1976); Dougherty v. Com., Dept. Of Health, 113 Pa.Cmwlth. 620, 538 A.2d 91 (1988); Moncrief v. Tate, 593 S.W.2d 312 (Tex.1980).
*334 The Supreme Court of Alaska provided a thoughtful discussion of the issue in Moore v. State, Dept. of Transp. and Public Facilities, supra, when confronted with the argument that the establishment of the civil service in the state constitution prohibited privatization of state jobs. The court found that the answer involved balancing two competing factors: the merit principles goal of insulating state workers from political influence and the state government's basic function "which is to govern, not to employ, and to govern effectively, the state must govern efficiently." 875 P.2d at 769. Recognizing that, just as in this case, the constitution allows state agencies broad discretion to eliminate positions and order layoffs for reasons of efficiency and economy, provided that their decisions are not politically motivated, the court described the remaining issue as whether a different, more restrictive rule is constitutionally compelled in the specific context of privatization, when the decision to cut spending by ordering layoffs is accompanied by a plan to enter into lower-cost private contracts for the same services. After recognizing that nothing in the applicable law prohibited the state from reducing its workforce and laying off personnel for reasons of economy, and that the state procurement code specifically vests the executive branch with broad authority to enter into contracts for services and professional services, the court concluded that there appeared to be little danger that privatization could successfully be used as a device for subverting the merit principle's primary goal of shielding state workers and jobs from political influence. State personnel rules that deal with layoffs offer protection against political influence, the court declared, by ensuring that state workers who are potential targets of layoff are treated fairly and that the effects of any actual layoff are mitigated. Furthermore, the court continued, the procurement code establishes extensive control over agency contracting procedures. Thus, the court held that while the social costs of privatizing the state workforce might justify legislative scrutiny, and while situations requiring judicial intervention on a case-by-case basis may arise from time to time, the risk that privatization poses to the merit system did not warrant the somewhat drastic measure of declaring it constitutionally barred. The court also emphasized that any risk arising from privatization must be balanced against the countervailing dangers of an unduly rigid reading of the constitution's merit system language, a reading that could extend the merit system provision beyond its originally intended scope.[7]Id. at 770-772.
*335 We agree with the vast majority of courts that privatization does not necessarily run afoul of the constitutionally created civil service system for the following reasons. The Home Rule Charter gives the mayor and city council broad authority to enter into contracts for professional services. Significantly, the mayor and city council have the authority to layoff city workers and close city-run facilities for reasons of efficiency and economy, without any regulation by the Commission. Further, nothing in the Constitution regarding the mayor's powers under the Home Rule Charter or the Commission's powers restricts the City from reducing its workforce and laying off employees for reasons of economy. Conversely, the constitution provides certain protections for civil servants laid off for economic or other reasons. La. Const. Art. X, § 10(A)(3). Finally, privatization may provide important benefits by reducing costs and increasing governmental efficiency and productivity, which the mayor and city council have the responsibility to determine. Thus, in light of these factors, and considering the above jurisprudence from other states, we see that the City has the broad discretion to enter into privatization contracts for reasons of efficiency and economy, provided that the decision to privatize is made without political motivation as to civil servants.
However, we also find that the mayor and city council do not have the unfettered discretion to potentially decimate the civil service system by eliminating all civil servant positions through privatization, and, therefore, we find that checks on that discretion are necessary and authorized by the Constitution. In fact, until the instant contract, the City routinely submitted proposed contracts for privatization to the Commission for its review and the Commission routinely approved these contracts. In order to exercise its authority to protect the civil service under the Constitution, we find that the Commission has the right to review all contracts that directly affect civil service employees within a reasonable period of time, prior to the contract's implementation.[8]
That being said, we must emphasize that the Commission's review is limited to that which is necessary to ensure that classified city employees are competitively selected on the basis of merit, free from political influence, and to protect classified employees from dismissal or disciplinary actions for religious or politically motivated reasons. Thus, the City must turn over all documents and other evidence which will enable the Commission to determine: (1) whether any civil service employees will be involuntarily displaced from the civil service; and, if so (2) whether the contract was entered into for reasons of efficiency and economy and not for politically motivated reasons. However, in conducting its review, the Commission has no constitutional authority to determine whether a service should or could be provided within the classified system, whether a contract is in the best interests of the City, or to second guess whether the fiscal restraints presented by the City justify privatization. Rule III goes much too far in this regard. For instance, Sec. 6.1 provides that all contracts for personal and professional services shall become effective only when approved by the Director. Further, Sec. 6.1 gives the Commission the authority to "determine whether [personal *336 or professional] services should be provided within the classified service." Sec. 6.2 provides that personal and professional services contracts will be approved "only when such services require unique or specialized skills not presently required of positions in the classified service, or where such services cannot be provided within the classified service." Sec. 6.4 refers to the Commission's review in situations where it becomes necessary to privatize due to "fiscal restraints or some other cause," and that no action by any agency of the City, State, or Parish Orleans to privatize shall be binding or effective until approved by the Commission. These are examples of the type of review that is beyond the Commission's constitutionally limited scope of review over City contracts.
If, after conducting the above two-part review, the Commission finds that no civil servants will be involuntarily displaced from the civil service, or, if they will, that the contract was entered into for reasons of efficiency and economy and not for politically motivated reasons as to the civil servants, it should approve the contract. However, if the Commission has good reason to believe that civil servants will be involuntarily displaced and that the contract was entered into, not for reasons of efficiency and economy, but for politically motivated reasons, it may refuse to approve the contract. However, it may not enforce its rule that the contract only becomes effective when approved by the Commission Director, as there is no provision in the Constitution that allows it to adopt such a rule, which effectively gives the Commission an ex parte injunction. Instead, the Commission has the right to challenge in court any privatization or other contract that it has good cause to believe was entered into by the mayor or city council as a pretext for the discriminatory dismissal or treatment of civil servants for religious or political reasons. Jurisdiction for this type of lawsuit lies in the state district courts pursuant to La. Const. Art. V, § 16(A) (A district court has original jurisdiction "of cases involving ... the state, a political corporation, or political subdivisions ... as a defendant").
Based on the above reasoning, we find that the portions of Rule III, Sec. 6.1-6.4 which give the Commission the ex parte authority to suspend the effectiveness of such contracts entered into by the City for personal or professional services, are beyond the power that is granted to it by Art. X, § 10(A)(1), and therefore unconstitutional. However, we find that the Commission Rules that generally provide for Commission review are constitutional, subject to the limitations expressed herein, that the Commission determine only whether civil servants will be involuntarily displaced, and, if so, whether the contract is being entered into for reasons of efficiency and economy and not as a pretext for the discriminatory dismissal of civil servants for religious or politically motivated reasons. Otherwise, we express no opinion as to the constitutionality of any other particular rules, as that would be premature.

CONCLUSION
In this case, the record reveals that the City did not properly submit the Agreement and all other evidence regarding privatization to the Commission. The Commission has therefore never approved or disapproved the Agreement, but held its ruling in abeyance and sought and obtained an injunction which was approved by the court of appeal.
We hold that the City must now properly submit the Agreement and all other evidence regarding privatization to the Commission for its approval or disapproval following a public hearing. If the commission *337 approves the Agreement, the matter is resolved. If the commission disapproves the Agreement, the Commission may bring an action in court, including injunction proceedings to temporarily enjoin the enforcement of the Agreement. Ultimately, the issue on the merits will be whether the Commission's decision to disapprove the Agreement is warranted under the guidelines discussed herein. At trial on the merits, the burden of proof will be on the Commission to establish by a preponderance of the evidence that the Agreement was not approved by the Commission after a full public hearing, and on the City to establish by a preponderance of the evidence that no civil servants will be involuntarily displaced, or, if they will, that the Agreement was entered into in good faith for non-political reasons as to the civil servants.

DECREE
The judgments of the lower courts with regard to the preliminary injunction are affirmed. However, the case is remanded to the trial court to establish a deadline for the city to submit the Agreement and its evidence to the Commission for review.
AFFIRMED IN PART AND REMANDED.
JOHNSON, J., concurs in part, dissents in part, and assigns reasons.
JOHNSON, J., concurs in part and dissents in part.
We granted this writ application to determine whether the City Civil Service Commission in enacting Rule III, Sections 6.1 through 6.4 had attempted to regulate beyond its jurisdiction.
The majority finds that portions of Rule III exceed the powers granted to the Commission by Constitution Article X, Section 10(A)(1) but ultimately concludes that the Commission rules that provide for review and approval of privatization contracts, prior to their implementation, are constitutional. While we pay lip service to the broad powers granted to the Mayor and Council over operation of City government under the City's Home Rule Charter, in fact, we have given the City Civil Service Commission veto power over any reorganization of City government.
The jurisprudence has long recognized that the Mayor and Council of the City of New Orleans have broad powers to reorganize government for reasons of efficiency and economy. The only limitation on this broad power is the requirement that the city act in good faith. The change must be a real and not a sham reorganization. The city is prohibited from any action for political or other prohibited reasons.
While the City Mayor and Council have acquiesced in the past to the Commission's demand that all contracts that eliminate civil service positions be submitted for review and approval prior to implementation, I am not convinced that we should elevate this practice to a constitutional right, and I respectfully dissent.
If the Commission believes that the City has acted in bad faith, or for a prohibited reason, the Commission should bring an action for injunctive relief in the District Court, as was done in this case.
In the proceeding for injunctive relief, the Commission, in my opinion, has the burden of proof as to all issues. It is the Commission's burden to establish that the City acted in bad faith, for political or some other prohibited reasons.
NOTES
[1] "Privatization" has been defined as "any process aimed at shifting functions and responsibilities, in whole or in part, from the government to the private sector." Donald G. Featherstun, et al., State and Local Privatization: An Evolving Process, 30 Pub. Cont. L.J. 643, 646 (2001). "Contracting out, the most prevalent form of privatization, occurs when a government entity uses a private contractor instead of public resources to provide a government service." Id.
[2] Section 6 provides as follows: "The legislature shall enact no law the effect of which changes or affects the structure and organization or the particular distribution and redistribution of the powers and functions of any local governmental subdivision which operates under a home rule charter." La. Const. Art. VI, § 6.
[3] The first civil service system under which the City operated was provided in the City Charter of 1896, Art 45 of 1896. This first act was emasculated two years later by Act 113 of 1898 and Act 89 of 1900. The Charter of 1912, Act 159 of 1912, Section 20 constituted the Board of Civil Service Commissioners as the mayor and two commissioners selected by the Commission Council. Its powers and duties were prescribed by Act 89 of 1900 as amended. Then in 1936 the system came under the control of the mayor. Act 338 of 1936 constituted the Board of Civil Service Commissioners as the mayor and two citizens of the City appointed by the mayor. The system was left to the Commission to devise by rule and regulation, and authority was given to include parochial employees. This was the prevailing law when Act 171 of 1940 was passed setting up the City Civil Service System which was to go into effect in 1943 and which laws could be repealed or amended by a two-thirds vote of the legislature. In 1948, the legislature abolished the civil service system in Louisiana by a two-thirds vote. Thus, scholars recommended that civil service be given constitutional status beyond control of the legislature. In 1952, the state legislature put forth a proposed amendment to the 1921 Constitution, Acts 1952, No. 18, which was submitted to and approved by the voters, enacting Article 14, § 15 of the 1921 Constitution creating both a state civil service commission and a New Orleans civil service commission. "To avoid discrimination and favoritism, to promote efficiency of governmental operation, and to encourage promotion based on merit, the electorate, by adoption of Section 15, has placed certain aspects of state and municipal classified employment beyond the pale of state and local governmental control." Barnett v. Develle, 289 So.2d 129, 143 (La.1974). The 1974 Constitution reaffirmed civil service's position as organic law by placing civil service for the City of New Orleans directly in the Constitution. The delegates to the 1974 Constitution rejected proposals which would have allowed the legislature by a two-thirds, or even three-fourths, vote to amend or modify the constitutional civil service provisions. "The interest and intent of a majority of the delegates in formulating the 1974 Constitution was to create an independent, autonomous, non-political state and city civil service `safeguarded and removed as far as humanly possible from any form of political influence or any suspicion of political influence or control.'" Civil Service Com. v. Guste, 428 So.2d 457, 461 (La.1983) (citing Dunbar at 504).
[4] The Commission has since adopted new rules, effective February 1, 2001, which provide more specific guidelines for the review of personal and professional services contracts and privatization contracts. Rule III, Secs. 6.1-6.6.
[5] In Firefighters II, certain of these terms were defined as follows:

(1) "qualifications" for employment refer to requirements as to education, experience or similar factors; (2) "compensation," "reduction in pay" and "certification" are related to a commission's express power to adopt a uniform pay and classification plan; (3) "political activities" involves the power of a commission not only to limit the political activities of public employees, but also conversely to protect public employees from discrimination and intimidation on the basis of political beliefs; and (4) "employment conditions" concern safety, hours of work, freedom from intimidation and the like.
Firefighters II, 590 So.2d at 1176-77.
[6] We further address this issue, infra, at pages 335-36.
[7] The Supreme Court of Maryland has held that the same rules that allow a state agency to layoff a merit system employee by abolishing the position which he holds, with the limitation that it be for a bona fide reason and not a subterfuge to evade the merit system laws, also governs the legitimacy of privatization of jobs performed by state classified employees. Ball, supra. Acknowledging the concern that privatization constituted a nefarious precedent whereby the protection afforded state employees under the merit system could be materially and substantially eroded by the wholesale contracting out to private contractors work performed by state employees, the court replied that it thought such a fear to be unwarranted, because unless such an action is done in good faith it is subject to challenge in court. Likewise, the Supreme Court of Nevada has held that the statute permitting the layoff of classified employees in case of the "abolition of a position or of other material changes in duties or organization" also permits the government to privatize positions originally held by state classified employees, if done in good faith, to effect a real and not fundamentally sham reorganization and also for substantial, rather than arbitrary and capricious reasons. University of Nevada v. State Emp. Ass'n, Inc., supra.

In Michigan, the supreme court has held that good faith can be established by showing that the position is to be abolished for reasons of efficiency and economy. Michigan State Employees Ass'n v. Civil Service Com'n, 141 Mich.App. 288, 367 N.W.2d 850 (1985).
[8] This is basically the way it has been done prior to this Agreement with no complaint.