906 So.2d 729 (2005)
RIVER BIRCH, INCORPORATED
v.
ROBIN & ASSOCIATES, INC., et al.
DAR, Inc. d/b/a Robin & Associates
v.
River Birch Incorporated.
Nos. 2004 CA 1561, 2004 CA 1562.
Court of Appeal of Louisiana, First Circuit.
June 15, 2005.
Rehearing Denied July 21, 2005.
*730 Peter J. Butler, Peter J. Buter, Jr., Murphy J. Foster, III, Richard G. Passler, New Orleans, for Appellant River Birch Inc.
Jacob J. Amato, Jr., Robert G. Creely, Gretna, Thomas A. Casey, Jr., New Orleans, for Appellees Robin & Associates, Inc. and DAR, Inc.
Before: PARRO, KUHN, and WELCH, JJ.
WELCH, J.
The facts in this case are indisputable; the contract at issue is contained in the *731 record and provides the best evidence regarding the terms and conditions contained therein. Additionally, all communications had in connection with the contract were recorded and transcribed by the Federal Bureau of Investigation and are part of the record. The salient issue before us is the enforceability of the contract entered into on June 1, 1995, between parties sophisticated in both business and politics: the appellant, River Birch, Incorporated (River Birch), and the appellee, DAR, Inc. d/b/a Robin & Associates (Robin).[1] Pursuant to the contract, entitled "Governmental Public Relations Consulting Agreement," River Birch, through its president, Albert J. Ward, Jr. (Ward) engaged the lobbying services of Dan A. Robin (Mr. Robin) for the purpose of defeating specific legislative bills, one of which was filed by House Speaker John Alario, that posed a threat to and, if passed, would prohibit the Louisiana Department of Environmental Quality from issuing essential permits needed by River Birch to begin operations as a landfill business. The contract provided for a $50,000 fee payable to Robin by River Birch if the legislation was defeated (or amended so it would not apply to River Birch's property) and an additional undivided 4% ownership interest in the landfill, contingent on whether River Birch received all the necessary permits and began operations.
With Robin's involvement, just days after the contract was signed, the bills were successfully defeated. River Birch began operating a landfill on July 1, 1999, is fully operational and is currently "making millions." River Birch paid Robin the $50,000 fee but has refused to transfer the 4% undivided interest in River Birch to Robin. This litigation followed.
Notwithstanding the undisputed facts and the clear terms and conditions of the contract, River Birch attacks the validity of the contract on three separate bases. First, it maintains the contract is null and void because Robin's failure to report its lobbying relationship with River Birch as a client constitutes a violation of the Lobbying Act, in particular, La. R.S. 24:53. River Birch alternatively maintains that the contract is void for vices of consent: fraud, misrepresentation and/or duress. Thirdly, River Birch argues that the lobbying fee negotiated in the contract is so excessive as to "shock the conscience" and should be stricken as contra bonos mores.
The district court rejected all of River Birch's arguments, found the contract was valid and ordered specific performance by River Birch's transfer to Robin of the 4% undivided interest in River Birch provided for in the contract. On appeal, River Birch claims the trial court erred in finding the contract valid and re-urges the same three arguments in support of its claim that the contract is an absolute nullity and unenforceable.
After a thorough review of the record, we are convinced that the factual findings as well as the legal conclusions reached by the trial court are supported by the evidence and the law. Accordingly, we affirm that judgment. The trial court's written reasons more than adequately discuss and resolve the issues raised in River Birch's assignments of error numbers two and three, regarding the alleged invalidity of the contract based on vices of consent and contra bonos mores. Therefore, we adopt *732 these reasons and incorporate them into this opinion as Appendix A.
To the extent that the result reached in this case appears to overlook or even condone flagrant and intentional violations of the disclosure requirements of the Lobbying Act, and for the purpose of addressing opinions by the Board of Ethics containing misinterpretations of the law, we write separately to more fully address the issues raised in appellant's assignment of error number one.

ASSIGNMENT OF ERROR NUMBER ONE
River Birch alleges the trial court erred as a matter of law by failing to find that Robin's failure to register River Birch as its lobbying client after the contract was negotiated between them violated the disclosure requirements of the Lobbying Act and that this purported violation rendered the object of their contract "in violation of a rule of public order," making it an absolute nullity. Robin admits that it is a lobbying firm and that Mr. Robin is a lobbyist. However, with respect to its relationship with River Birch, Robin asserts it was not subject to the disclosure requirements of the Lobbying Act, which it argues applies only to lobbyists with expenditures of more than two hundred dollars. Alternatively, Robin argues the Lobbying Act and its disclosure requirements are irrelevant in determining the validity of the contract. Robin notes that the Lobbying Act does not govern or regulate the contents of contracts between lobbyists and their clients; therefore, the penalty provisions contained in the act for disclosure violations (which must be strictly construed as a matter of law) cannot be applied to invalidate an otherwise lawful contract. Robin maintains its contract with River Birch had a lawful cause  lobbying services aimed at defeating a legislative bill. Robin asserts it fulfilled its obligations under the contract in that the legislation was defeated and River Birch is now fully operational.

THE LOBBYING ACT
The Lobbying Act, La. R.S. 24:50, et seq., applies to "lobbyists," as defined in the act. La. R.S. 24:52. The Lobbying Act defines lobbyist as:
[A]ny person who is employed to act in a representative capacity for the purpose of lobbying if lobbying constitutes one of the duties of such employment, or any person who receives compensation of any kind to act in a representative capacity when one of the functions for which compensation is paid is lobbying and makes expenditures as herein defined of two hundred dollars or more in a calendar year for the purpose of lobbying.
La. R.S. 24:51(5). (Emphasis added.) "Expenditures" is defined in La. R.S. 24:51(2) as "the purchase of food, drink or refreshment for a legislator."
Lobbyists are required to register specific information,[2] in writing and under oath, with the secretary of the Senate or the clerk of the House of Representatives. La. R.S. 24:53(A) requires this registration within five days of employment as a lobbyist or within five days after the first action requiring his registration as a lobbyist. Additionally, La. R.S. 24:53(C) requires that within ten days after his registration and after each renewal, the lobbyist shall file a statement signed and under oath from each *733 person by whom he is employed and from each person whom he represents authorizing him to act as the lobbyist for the person. Pursuant to subsection (E), the lobbyist's registration expires annually on January 31st unless the lobbyist seeks a renewal. Whenever the information in the original registration changes or the lobbyist begins representing an additional person, La. R.S. 24:53(H) requires the lobbyist to file a supplemental registration within five days of such change.

Did Robin Violate the Lobbying Act?
The record contains a form registering Robin & Associates as a lobbyist for the 1995 calendar year. The record also contains two lobbying renewal registration forms filed on behalf of Robin listing as its 1995 lobbying clients the Orleans Levee District-Board of Directors and the Louisiana Safety Association of Timbermen. The record also contains a lobbying expenditure reporting form filed on behalf of Robin reporting no expenditures in excess of two hundred dollars for the calendar year 1995. Absent from the record is any form or other documentation revealing Robin's representation of River Birch.
Robin maintains that disclosure was not required because there were no expenditures made in connection with the lobbying services provided to River Birch; therefore, he was not a "lobbyist" subject to the act's requirements. In support of this argument, Robin relies on interpretations of the Lobbying Act provisions by the clerk of the House of Representatives and the Board of Ethics which conclude that, pursuant to the definition in La. R.S. 24:51(5), a person is not a lobbyist (who is required to file a supplemental registration form) as long as the expenditures related to a client's representation are below two hundred dollars. Ordinarily, the interpretation given a statute by regulating authorities is entitled to deference;[3] however, as discussed below, the opinions relied on by Robin are based on a misstatement of the applicable statutory language-rendering those interpretations fundamentally flawed and entitled to no weight.
Robin introduced into the record an opinion issued by Alfred W. Speer, the clerk of the House of Representatives, which interprets the definition of lobbyist provided in La. R.S. 24:51(5) as applicable to a person employed or compensated to lobby AND who expends two hundred dollars or more in a calendar year in the furtherance of lobbying. Robin also introduced several opinions by the Board of Ethics echoing that interpretation of the definition of a lobbyist to include "only those persons who are employed or compensated to lobby and who make expenditures of $200 or more in a calendar year."
These opinions completely ignore the statutory use of the disjunctive "or" and erroneously insert the conjunctive "and," yielding an entirely erroneous and unintended interpretation of the lobbyist disclosure requirements. No one disputes that in 1995 Robin & Associates, Inc. was in the business of providing lobbying services or that Mr. Robin was employed as a lobbyist. Indeed, the record contains the 1995 registration form filed by Robin as a lobbyist and the supplemental forms listing specific entities as clients, notwithstanding the absence of expenditures in excess of two hundred dollars in connection with his representation of those clients. The very clear and unambiguous language defining lobbyists for purposes of disclosure requirements as "any person who is employed to act in a representative capacity for the purpose of lobbying" squarely encompasses Robin.
*734 The Lobbying Act does not specifically define "employ", but provides that a person is "employed" as a lobbyist if he is engaged in a representative capacity and if lobbying constitutes one of the duties of such employment. Black's Law Dictionary 471 (5th Ed.1979) defines "employ" as:
To engage in one's service; to hire; to use as an agent or substitute in transacting business; to commission and intrust with the performance of certain acts or functions or with the management of one's affairs.
Clearly, Robin was employed, within the scope of the statute, by River Birch to represent it for the specific purpose of lobbying against a bill. The record supports the trial court's rejection of Robin's attempt to evade the definition of lobbyist subject to the act by claiming that Robin's contractual classification as an "independent contractor" rather than an employee, means it was not employed by River Birch. A party may not by contractual agreement redefine terms to give them unintended legal consequences or to avoid legal consequences. Therefore, notwithstanding the contractual language employed by the contracting parties, and all semantics aside, there is no dispute that Ward specifically and intentionally engaged Robin's services as a lobbyist with the specific request and aim that Robin lobby and defeat the bills posing a threat to River Birch's proposed landfill business. There is also no dispute that Robin agreed to provide those services and did so. Under these facts and circumstances, it is simply inescapable that Robin was a lobbyist employed by River Birch to act in a representative capacity for the purpose of lobbying within the scope of the Lobbying Act. Because Robin clearly falls within the scope of lobbyist as first defined in the statute, the disjunctive provision containing the expenditure requirement is not even reached. A straightforward application of the statute obligated Robin to report and disclose its representation of River Birch. It was neither disclosed nor reported; therefore, Robin was clearly in violation of the act.

Does the Disclosure Violation Invalidate the Contract?
The trial court concluded that as a matter of law, Robin's failure to disclose, albeit in violation of the Lobbying Act, did not invalidate the contract, which otherwise had a valid lawful cause. The Lobbying Act does not address nor govern contracts negotiated between lobbyists and clients. It governs the public disclosure of the identity of persons who attempt to influence legislative actions and related expenditures. See La. R.S. 24:50. The act contains its own penalty provisions, consisting primarily of relatively nominal monetary fines.[4] La. R.S. 24:59. The act also governs the enforcement of its provisions, naming the Board of Ethics for Elected Officials as the entity responsible for and authorized to impose and collect penalties for violations thereof. La. R.S. 24:58. Therefore, it is not within our province to create a private right of action and impose civil penalties for the evident and intentional violations of both the stated purpose and substance of the Lobbying Act. However, and for the reasons articulated by the trial court, there exists no *735 legal authority for invalidating the contract on the basis of these statutory violations.

CONCLUSION
For all of the foregoing reasons, and those in the trial court's written reasons attached hereto, the judgment is affirmed. River Birch is assessed all costs of this appeal.
AFFIRMED.
PARRO, J., concurs and assigns reasons.
KUHN, J., concurs and assigns reasons.

APPENDIX

WRITTEN REASONS
River Birch is a corporation whose president is Jim Ward. About 1968 it acquired a 600-acre tract of land, which was bisected by a railroad track, and he developed the northern half into a residential subdivision. Unable to obtain a railroad crossing to access the southern half, Ward abandoned his plans to construct residential housing there. Later, this objective was further hampered when Jefferson Parish constructed the Kelvin Landfill on the east side of his property, constructed a sewage sludge pit on the west side, and GNOL (Carlos Marcello) obtained a landfill on the south side of his property. In the 1980's, the Louisiana Department of Environmental Quality began requiring landfills to comply with Subtitle D. These conditions were more stringent than previous one and required liners and collection systems. Ward was aware that neither GNOL nor the Kelvin Landfill would be able to comply with these new requirements, thus making a landfill on his property a better opportunity.
There was some opposition to the landfill from various neighborhood groups and John Alario, the Speaker of the Louisiana House of Representatives, and the representative from this area filed a bill during the 1995 regular session of the legislature to prevent the River Birch landfill from becoming operational (HB 1819).
Ward had invested a considerable sum in engineering studies and various other costs ($940,000) and HB 1819 would kill his plans. A subcontractor friend, Clement Boutpey, contacted him and told him the newspaper had reported on Alario's filing of HB 1819. Boutpey suggested that Ward contact a friend of John Alario, Augie Grimaldi, for help. Grimaldi contacted him and told him to call Dan Robin in Alario's office to get the problem resolved. Ward contacted Robin and met with him at Alario's office in mid April. Robin agreed to work on behalf of River Birch in an attempt to defeat HB 1819. A contract was signed on June 1, 1995. The contract provided that Robin was to provide lobbying services for the defeat of HB 1819 (and companion Senate Bill 702), and River Birch would pay Robin $50,000. Additionally, if the legislation was defeated and River Birch received all the necessary permits so that they could construct and open the landfill, Robin would receive an additional 4% undivided interest in the landfill.
The legislation was defeated, the various permits were issued by the regulatory agencies and the landfill began operations on July 1, 1999. Ward paid the $50,000 to Robin, but never transferred any interest in the landfill to him.
River Birch claims the contract is a nullity and unenforceable for several reasons: 1. failure of Robin to register River Birch in violation of the 1995 lobbying *736 statute (La. R.S. 24:53); 2. error; 3. fraud; and 4. economic duress. The trial was unusual in one respect, there is no dispute about what was said during the course of the various meetings between the parties. Because of interests that are not germane to this lawsuit, Ward taped all the conversations between himself and Robin and transcripts of these conversations were introduced into evidence.
Robin did not list River Birch as a client in 1995 in the lobbyist report required to be filed with the Senate and the House. Robin suggests, that the River Birch lobbying job came about in mid session and he probably forgot to list them. However, in 1994 he acquired Georgia Pacific in midsession and did register them. He states that they filed the required registration for him. River Birch's reliance on this statute is misplaced. While the statute does require the lobbyist to list his clients, this would not make the contract void or unenforceable. River Birch and Robin entered into a contract with a valid cause. Robin was obligated to perform lobbying services and he did so. In fact, he successfully performed these services and accomplished his client's objective. Regardless of the failure to register, if the contract is otherwise valid, then it is enforceable.
River Birch claims the contract is unenforceable because of fraud and error. River Birch points to the various and frequent examples of representations (misrepresentations) made by Robin to Ward. Robin represented that he was very closely aligned with Alario and he could get him to kill the bill. He gave numerous examples of their close ties and connection. He told Ward that he was the only one who could defeat the bill. He further told him they were close friends, they went on vacations together, he operated out of Alario's office, and he stayed at Alario's apartment in the Pentagon Barracks. He certainly exaggerated this relationship and he certainly embellished his own qualifications and significance to Ward. There is no question that he inflated his importance. On cross-examination he tried to explain that he meant something other than what he obviously said. River Birch contends that his embellishment and exaggeration amounted to misrepresentations such that the contract should be nullified. They suggest that Ward was influenced by these misrepresentations into erroneous beliefs about Robin's qualifications and abilities, and, more importantly, his relationship with Alario. However, even if much of what Robin said was not correct or at worst an exaggeration, he was still able to accomplish the objective for which Ward hired him. Thus, it would seem that the `cause' for the contract was not the actual relationship between Alario and Robin, but the defeat of the legislation. This was accomplished. Additionally, Ward admitted that he signed the contract with no intention of complying with the provision of giving the 4% interest to Robin. While Ward stated that he believed he was the victim of a conspiracy between Alario and Robin to hold his landfill hostage, there is no indication or evidence that Alario had any knowledge of nor participation in the activities of Robin.
Lastly, River Birch claims that the contract should be void because of economic duress. "Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation. In determining the reasonableness of the fear, the party's age, health, disposition, and other personal circumstances must be considered." La. C.C. art. 1959. Such duress is determined by applying subjective as well as objective standards. Averette v. Industrial *737 Concepts, Inc., 95-1286 (La.App. 1 Cir. 4/30/96), 673 So.2d 642. The subjective element is the party's personal reaction to circumstances, and the objective element is the reasonableness of the fear and unjustness of the injury based on how a reasonable person would react under those circumstances.
In determining whether consent is vitiated by economic duress, the court must first examine the objective characteristics of the plaintiff and then decide whether other reasonable persons, with the same subjective characteristics would have felt forced into signing a contract under the same type of threat. Standard Coffee Service Company v. Babin, 472 So.2d 124 (La.App. 5th Cir.1985).
Ward clearly expressed his feeling that he had no choice, but sign whatever agreement Robin wanted. He stated that he felt his landfill was being held hostage and the agreement for ownership of a percentage of the business was the ransom. He stated that Robin implied the whole matter was a sham or subterfuge. Once Robin had an agreement, Alario would allow the bill to be defeated. It was important that Alario "look good" to his constituents, while defeating the bill. Thus, Ward stated that he had no alternative but to sign the agreement with Robin giving him the 4% ownership interest. Considering all the representations or misrepresentations made by Robin, it is easy to see how Ward had apprehensions about the whole situation. However, Ward had been a businessman for a number of years involved in numerous projects. Robin initially wanted a 10% interest and Ward was able to negotiate it to 4%. He testified that Robin had wanted to include the Grimaldi brothers, friends of Alario who owned a construction company, in the contract to build the landfill. According to Robin this would help get Alario to kill the bill. However, since he had his own construction business, Ward did not need the Grimaldis and he was able to negotiate the contract without including them in it. Ward was a sophisticated businessman whose brother had been on the Jefferson Parish council. He did not accept everything that Robin requested. He negotiated the contract. He did not seek the advice of his brother, his stepson (an attorney from a political family) nor did he consult with any other lobbyists. These are things one would expect a `reasonable person' to do in this situation. Most economic duress cases involve an employer/employee relationship in which the employee is at a disadvantage in the negotiation. "It results when a person makes an improper threat that induces a party who has no reasonable alternative to manifest his assent." Pellerin Construction, Inc. v. Witco Corporation, 169 F.Supp.2d 568, 579 (E.D.La.2001). Ward had other alternatives; he failed to pursue them. Also, and maybe more importantly, his contract with Robin was successful. The legislation was defeated. It is not the province of the courts to relieve a party of a bad bargain, no matter how harsh. Sunrise Construction and Development Corporation, Belair Partnership and Coast Quality Construction Corporation v. Coast Waterworks, Inc., XXXX-XXXX (La.App. 1 Cir. 6/22/01), 806 So.2d 1. Ward obviously feels he made a bad bargain and does not want to comply. However, there is no reason he should not.
For these reasons there is judgment in favor of Robin and against River Birch finding that the contract is valid. Costs are assessed against River Birch.
PARRO, J., concurring.
The majority opinion concludes that the contract in this case was enforceable, and that its enforceability was not affected by whether or not the Lobbying Act was violated *738 by Robin. I agree with those conclusions. However, I am writing this concurring opinion to express my disagreement with those portions of the opinion addressing the interpretation and alleged violation of the Lobbying Act, all of which are unnecessary to the resolution of the issue before the court, and are, therefore, purely dicta. As such, these comments should have been omitted, as they have no precedential value for this or any other court. See Scott v. American Tobacco Co., 98-3016 (La.2/26/99), 731 So.2d 189. Moreover, I believe this analysis of the provisions of the Lobbying Act is incorrect, for the following reasons.
As noted by the majority, the Lobbying Act, in La. R.S. 24:51(5), defines "lobbyist" as "any person who is employed to act in a representative capacity for the purpose of lobbying ... or any person who receives compensation of any kind to act in a representative capacity" to perform a lobbying function. (Emphasis added). Certainly, as noted by the majority opinion, the use of the word "or" delineates two different definitions. The first portion speaks of employees, while the second portion addresses persons who are not employees, but who receive compensation for performing lobbying functions. Following these two definitions is the modifying phrase, "and makes expenditures ... of two hundred dollars or more in a calendar year for the purpose of lobbying." (Emphasis added). The majority interprets this phrase as modifying only the second definition, whereas it seems more likely that this phrase is intended to modify both of the preceding definitions, rather than just the second one. The opinion provides no explanation, nor can I think of any reason, why the monetary threshold applicable to compensated lobbyists should be different from that applied to employee lobbyists, thus requiring one group to register and follow other provisions of the Lobbying Act, while the other group is not subject to these requirements. Furthermore, this interpretation is directly contrary to the opinions of the clerk of the House of Representatives and the Board of Ethics, to which this court should ordinarily give deference because of their greater experience with this provision and its application.
Even more troublesome is the portion of the report disposing of Robin's contractual designation as an Independent contractor, which ordinarily would place the company into the second category of compensated lobbyist, rather than employee lobbyist. The majority opinion, in effect, collapses both definitions in the statute into one by concluding that anyone who is hired to do lobbying is an employee. This is stated without citation to any jurisprudential authority and without examining any of the factual circumstances that generally are applied to distinguish these two categories. It seems obvious that the legislature differentiated between the two definitions in recognition of the fact that, as a matter of law and in many contexts, there can be very different legal connotations and consequences, depending on whether a person is an employee or an independent contractor. See, e.g., Cador v. Neal's Cypress Inn, 02-1976 (La.App. 1st Cir.8/20/03), 859 So.2d 165, writ denied, 03-2657 (La.12/12/03), 860 So.2d 1160 (workers' compensation context); Civil Service Com'n of City of New Orleans v. City of New Orleans, 02-1812 (La.9/9/03), 854 So.2d 322 (civil service context); Ruiz v. Oniate, 97-2412 (La.5/19/98), 713 So.2d 442 (medical malpractice context). This court should avoid straying into such risky territory in order to reach a conclusion that is not even necessary to the ultimate resolution of the issue before us.
Therefore, I respectfully concur in the result only.
*739 KUHN, J., concurring.
The facts of this case demonstrate compellingly that the legislature needs to vigorously revise the applicable statutes governing lobbying activities. The potential for serious abuse justifies full and complete disclosure of all representative relationships.
NOTES
[1] The appellee was also sometimes referred to as "Robin & Associates, Inc." which is how the contract was drawn. Also, River Birch's Third Supplemental and Amending Petition names "Robin & Associates, Inc." as an additional defendant. This opinion will consistently refer to the business entity as "Robin."
[2] The required information includes the lobbyist's name and business address, the name and address of the person by whom he is employed, the name of the person or by whom he is paid and a photograph.
[3] State v. BP Exploration & Oil, Inc., 96-0716 (La.1/14/97), 686 So.2d 823, 828.
[4] Pursuant to La. R.S. 24:59, any person required to register as a lobbyist and who fails to do so may be assessed a civil penalty of not more than one thousand dollars. And, any person required by the act to register and file reports who knowingly fails to register, file a report, or fails to report accurately information required by the act to be disclosed shall be assessed a penalty not to exceed five thousand dollars per violation and the legislature may prohibit such person from lobbying for not less than thirty days and not more than a year.