DANIEL L. DYSART, Judge.
_|jThe City of New Orleans (the “City”) and its co-defendants seek review of the district court’s grant of a writ of mandamus directing the City to “immediately budget, appropriate for and pay to the New Orleans Fire Fighters [sic] Pension & Relief Fund ... the sum of $17,524,329 as the Actuarially Required Contribution to *414 the ‘New System’ administered by the Fund.”[1]
The City raises several issues on appeal, the most significant of which is whether mandamus is the proper procedure for the enforcement of a statutory provision regarding the funding of the New Orleans Firefighters Pension and Relief Fund (the “Fund”). The City contends that the statute upon which appellees rely, and upon which the trial court’s judgment is based (La. R.S. 11:3384), is [ 2vague and ambiguous. It further maintains that, because of the statute’s ambiguity, it cannot be used in the context of a mandamus proceeding, as that applies strictly to “ministerial” acts which are, by their very nature, definitive and not subject to interpretation. The City also contends that the statute is discretionary and creates no affirmative obligation on its part to contribute to the Fund.
We have reviewed all of the issues raised by the City in this appeal. For the

Amount allegedly owed

$13,913,495
$23,782,819 (or $1,981,901.58 monthly)
2012 $29,424,359
The Petition thus maintained that, by December 31, 2012, the cumulative projected amount of the underfunding would be reasons set forth below, we affirm the trial court’s judgment.
FACTUAL AND PROCEDURAL BACKGROUND
On July 19, 2012, the Trustees of the Fund filed a Petition for Writ of Mandamus (“Petition”), requesting that the court order defendants to pay sums allegedly owed to the Fund by the City pursuant to La. R.S. 11:3384. More particularly, the Petition alleged that an actuary, retained by the Fund as required by La. R.S. 11:3363(D),[2] determined certain amounts to be paid into the fund for the years 2010 forward. The City contributed those funds through July, 2010. However, according to the Petition, beginning in August, 2010, the City unilaterally reduced the amount it contributed to the Fund and has continually failed to make contributions based on the figures determined by the actuary.
The Petition alleged that the amounts owed by the City and the City’s contributions have been as follows:

Amount contributed

$10,635,430
$750,000 per month (resulting in a shortage of $12,546,131)
$11,900,000[3]
$34,163,319. The Petition sought the immediate appropriation and payment of *415 $17,524,359 by the City to the Fund.[4]
In response to the Petition, defendants filed an Answer, along with Exceptions of No Cause of Action, No Right of Action and Unauthorized Use of Summary Proceedings. The Exceptions were denied after a hearing held on December 19, 2012. Defendants applied for a supervisory writ with this Court, which was denied on December 28, 2012. The Louisiana Supreme Court also denied defendants’ writ application. New Orleans Fire Fighters Pension and Relief Fund v. City of New Orleans, 13-0009 (La.1/4/13), 106 So.3d 540.
In the interim, on September 11, 2012, defendants filed a Reconventional Demand against the Trustees, alleging that they mismanaged the “investments of the assets of the Fund.”[5] The Reconventional Demand sought injunctive relief, precluding the Trustees from using certain financial consultants and damages in the form of “any amounts that [the City] has been or will be called to pay into the Fund due to any deficit pursuant to La. R.S. 11:3361 and 11:3375.” Defendants also sought the right to take over management of the Fund.
14Trial on the mandamus was held on January 7-8, 2013. During the course of the trial, counsel for defendants attempted to cross-examine a witness regarding investment choices made by the Trustees. The trial court sustained the Trustees’ objection to this line of questioning and refused to allow any evidence of the Trustees’ fiscal mismanagement as alleged in the City’s reconventional demand. A supervisory writ to this Court on this issue was denied on January 8, 2013.[6]
On March 28, 2013, the District Court issued its Judgment, ordering that a writ of mandamus issue directing the City to immediately budget, appropriate and to pay to the Fund the amount of $17,524,329 together with judicial interest from date of demand. A Motion for New Trial filed by the City was denied and this timely sus-pensive appeal followed.[7]
DISCUSSION

The City’s required contributions to the Fund

The Firefighters’ Pension and Relief Fund is made up of two distinct retirement plans: the “old system,” covering firefighters employed prior to January 1, 1968 and the “new system,” covering all firefighters employed after December 31, 1967, as well as those employed before 1968 who have elected to come under the new system. The distinction between the two systems was detailed by this Court in Rapp v. City of New Orleans, 98-1714, pp. *416 31-32 (La.App. 4 Cir. 12/29/99), 750 So.2d 1130, 1149:
... New Orleans firemen contributed retirement income into one of two retirement plans. Employees, who were hired prior to January 1, 1968, invested into a benefits package, which is commonly referred to as the “old” Isplan. The old plan was not actuarially funded in advance. In other words, the calculations of firemen’s benefits in this plan did not consider the extent of retirement payments to an individual employee based on life-expectancy figures. Also, the contributions made by the current employees under the old plan are not invested to cover future benefits. Therefore, the old plan was referred to as the pay-as-you-go plan. Additionally, the employer did not make any contributions in the old plan ...
Conversely, employees who were hired after January 1, 1968, invested in an actuarially determined defined benefit plan, which is known as the “new” plan. Under the new plan, both the employee and the employer contribute to the plan, and interest accumulates on these contributions from various outside sources. In the new plan, benefits paid to the employee are funded on an overall basis, meaning the benefits due to each individual employee was funded by the pool, not by funds accumulated, set aside, segregated or accounted for separately for that individual.
There is no question that the City is to contribute to the Fund; however, the parties dispute what funding is statutorily required of the City. The City argues that the only mandatory funding requirement for the entire Fund, old and new alike, is found in La. R.S. 11:3361, which provides, in pertinent part, that:
[T]he city shall pay into the fund annually one percent of the revenues derived from all licenses issued by the city, except the drivers and chauffeurs licenses, and an annual appropriation in the budget of the city of a sum equal to not less than five percent of the money annually appropriated by the city for the operation and maintenance of the fire department of the city.
The record reflects that the City has consistently complied with the requirements of this statute and it is not at issue herein.[8] It is the City’s obligation under La. R.S. 11:3384(F) which is in dispute. That statute provides:
|fiF. On account of each member who comes under the provisions of this Section applying to persons employed after December 31, 1967, either because of date of employment or due to election as provided herein, there shall be paid annually by the city and credited to the pension accumulation account a certain percentage of the earnable compensation of each member, to be known as the “normal contributions”, and an additional percentage of this earnable compensation to be known as the “accrued liability contribution”. The percentage rates of such contribution shall be fixed on the basis of the liabilities of the retirement system as shown by actuarial valuation. (Emphasis added).
Thus, La. R.S. 11:3384(F) requires the City to contribute two separate and *417 distinct amounts: the “normal contribution” and the “accrued liability contribution,” both of which are to be determined by “actuarial valuation.” This actuarial valuation is to be computed by an actuary retained by the Board; La. R.S. 11:3363(D) mandates that the Board of Trustees “shall employ an actuary who shall annually certify to the board the amount of contributions required by the city and other sources to maintain the system on an actuarial basis.” (Emphasis added).[9] Construed together, the statutes require the Board to retain an actuary to determine the amount the City shall contribute to the Fund. The statute does not indicate, as the City suggests, that these contributions are discretionary. The statute’s use of the term “shall,” rather than “may,” leaves no doubt that the | legislature intended to require that the City make these contributions. If, as the City argues, the only mandated funding statute is La. R.S. 11:3361, then the legislature’s enactment of La. R.S. 11:3384 was meaningless and the statute has no effect.
We find, as did the trial court, that the mandates provided in 11:3385(F), as well as 11:3363(D), were specific enactments of the legislature to provide an actuarial funding mechanism for the new system. This is in keeping with this Court’s recognition that “the new system is legally required to have advanced funding” so that “the annual contributions made by the city are sufficient not only to pay anticipated benefits for that year, but also to build up the fund.” Nicolay v. The City of New Orleans, 546 So.2d 508, 511 (La.App. 4 Cir.1989). We can find no other reasonable alternative explanation for the existence of both statutes.
We recognize that the statutes at issue require the City to contribute to the Fund an amount “to maintain the system on an actuarial basis,”[10] but do not prescribe the precise manner or specific formula by which the actuary is to determine the appropriate amount to be paid each year by the City. However, until 2010, the City annually paid the full amount an actuary determined to be owed under this La. R.S. 11:3384(F); clearly the statute has been interpreted and implemented in the same manner for many years without objection as to how the accrued liability contribution was determined. Moreover, although actuarial science is necessarily imprecise and requires that various assumptions be made, this does not render the statutory scheme impermissibly vague in application.
| ^According to the Fund’s actuary since 2000, Michael Conefry, who was accepted without objection as an expert in the field of actuarial science,[11] La. R.S. 11:3384 is *418 vague only in that the terms “normal contribution” and “accrued liability contribution” are not “typical terms” used by actuaries. Rather, as Mr. Conefry explained, and as is contained in his September 10, 2012 report, these terms have traditionally been interpreted by Louisiana actuaries as meaning the “Normal Cost” and “Unfunded Accrued Actuarial Liability Amortization Amount” under the “Entry Age Normal Cost Method,” which is “an actuarial cost method widely used in the funding of defined benefit pension plans in both the public and private sectors.”[12]
Mr. Conefry further explained that the statute requires an actuarial valuation, which is:
... a process whereby the actuary collects census data and financial information concerning the defined benefit plan and calculates the projected actuarial present value of the benefits to be delivered under the plan, and uses certain mathematical processes called actuarial cost methods, or at least one actuarial cost method, to produce the annual funding contributions. It’s a self-correcting annual process where the census and financial data is updated each year with changes of the usual dates of birth, hiring and salary information, retirees, turnover and so forth.
... the basic fundamental goal is to take the amount to be funded for the future, the total actuarial present value of benefits expected to be delivered, less the current value — actuarial value of the assets, and spread that over the future on a reasonable and consistent basis so that the |3value of the benefits is paid for.
And the ideal goal and funding for a defined benefit plan is to fund for the liabilities or the value of benefits as they are accruing and that’s what the actual cost method is designed to do.
Necessarily, the valuation determines on a yearly basis the amount of the contribution required of the City, which, according to Mr. Conefry, takes into account “the known sources of such contributions, typically member contributions and sometimes other sources such as dedicated taxes and the like.” The balance comes from the employer contributions; that is the amount “not provided by all of the other sources” which “must be delivered by the employer.”
Mr. Conefry further explained that “the value of the member contributions are determined in this case, by subtracting the total actuarial present value from the amount necessary, the total present value of all benefits. And then the net amount to be funded is what the employer and employer-related sources are required to pay.”
This accepted practice of actuarial methodology had been used for the Fund since 1987 and Mr. Conefry continued to use this method after becoming the Fund’s actuary in early 2000. Every year until 2009, the City paid the sum (or the approximate sum) which Mr. Conefry determined to be the actuarially required contribution. Beginning in 2010, however, the City failed to make the full contribution as determined by Mr. Conefry and the City has failed to fully contribute since that time. Although the City maintains that it has complete and total discretion to contribute the actu-arially required contribution, it offered *419 nothing at trial to indicate what it believes is the appropriate amount for its actuarially required contribution. Its expert actuary, Adam Reese, while critical of certain aspects of Mr. Conefry’s evaluation and assumptions, failed to offer his 110own recommendation for the actuarially required contribution of the City. Rather, Mr. Reese was only retained to assist the City “in understanding the plaintiffs’ case and how the actuarial elements of that fit into it.” Mr. Reese did not testify as to what, in his opinion, the City’s payments should have been for the period in question. And, the City offered no other witness on this issue.
The only testimony at trial concerning the amount owed by the City as its actuar-ially required contribution to the Fund came from Mr. Conefry. His testimony in this regard was consistent with the allegations of the Petition. There was no other evidence presented as to the amount owed by the City. Accordingly, we affirm the trial court’s award of $17,524,329.00 as the City’s actuarially required contribution at this time.
We note that the statutes do not contain any specific provision by which the City may challenge the amount determined by the Fund’s actuary to be the City’s accrued liability contribution. However, “[i]t is not our function as a court of appeal to legislate.” Simmons v. Louisiana Dept. of Public Safety and Corrections, 2007-0572 (La.App. 4 Cir. 12/12/07), 975 So.2d 1, 3. See also, Hamilton v. Royal International Petroleum Corp., 05-846, p. 10 (La.2/22/06), 934 So.2d 25, 33 (“[c]ourts are not free to rewrite laws to effect a purpose that is not otherwise expressed.”). Rather, “[t]he function of statutory interpretation and the construction to be given to legislative acts rests with the judicial branch of the government.” Rebel Distributors Corp., Inc. v. LUBA Workers’ Comp., 13-0749, p. 14 (La.10/15/13) _ So.3d _, 2013 WL 5788791, citing Livingston Parish Council on Aging v. Graves, 12-0232, pp. 3-4 (La.12/4/12), 105 So.3d 683, 685. To the extent that any deficiencies in the statutory scheme exist, those are matters for the legislative branch to address.
| nAvailability of mandamus procedure
Having determined that the City must contribute to the Fund pursuant to La. R.S. 11:3384(F), we turn to the City’s argument that mandamus is an improper procedure for this matter, which the City maintains should have been tried by ordinary process.
La. C.C.P. article 3863 provides that a writ of mandamus may be issued “to a public officer to compel the performance of a ministerial duty required by law, or to a former officer or his heirs to compel the delivery of the papers and effects of the office to his successor.” Under La. C.C.P. art. 3862, a mandamus “may be issued in all cases where the law provides no relief by ordinary means or where the delay involved in obtaining ordinary relief may cause injustice.”
This Court has repeatedly determined that the proper procedure for the enforcement of obligations set forth in the pension statute is mandamus, as the City’s funding requirement is a ministerial function. The Nicolay, supra, court specifically noted:
This court has already determined that the proper procedure for enforcement of the obligations set forth in the pension statute is mandamus because payment by the City requires the City as a ministerial function to make an appropriation. Board of Trustees of Firemen’s Pension & Relief Fund v. City of New Orleans, 217 So.2d 766 (La.App. 4th Cir.1969). Mandamus lies to compel the performance of prescribed duties that are purely *420 ministerial and in which no element of discretion is left to the public officers, but there must be a clear and specific legal duty which ought to and can be performed. Felix v. St. Paul Fire and Marine Ins. Co., 477 So.2d 676 (La.1985).
d., 546 So.2d at 512. This Court then held that, as “the trial court’s judgment require[d] the City to perform a purely ministerial function in making the payments to the Fund, it should have included a writ of mandamus.” Id.
The Board of Trustees case, cited by the Nicolay court, involved a petition for mandamus seeking to compel the City to appropriate a sum for cost of living increases in conformity with La. R.S. 33:2117 (redes-ignated as La. R.S. 11:3382), which authorized the board of trustees of the Fund to “use interest earnings on investments of the system in excess of normal requirements as determined by the actuary to provide a cost of living increase in benefits for members who have retired, in an amount not to exceed two percent of the original benefit for each year of retirement.” The statute is similar to La. R.S. 11:3384(F) in that it required an actuarial determination of the amount to be funded. The Board of Trustees court found that mandamus was the appropriate procedure, noting:
The statute which has formed the subject matter of this tedious litigation is a mandatory law, and the defendants, the City of New Orleans, are required as a ministerial function to make the appropriation, and it is for this reason that mandamus is the proper procedure for the enforcement of this obligation.
Id., 217 So.2d at 769.
Accordingly, in this matter, we find that mandamus was a proper procedural vehicle to direct the payment by the City of its mandatory contribution to the Fund. We agree with the trial court’s finding that the City’s funding obligations are ministerial in nature and that any delay in that funding process “may” cause an injustice, thereby warranting the issuance of the writ of mandamus. We therefore | ^affirm the trial court’s issuance of a mandamus directing the City to make the actuarially required contribution to the Fund.[13]
We now turn to the City’s remaining arguments: (1) that the trial court erred in denying its Peremptory Exception of No Right of Action insofar as the relief requested violates the separation of powers doctrine; (2) that the mandamus improperly destabilizes the City’s 2012 balanced budget and (3) that the trial court erred in refusing to allow evidence of the Trastees’ financial mismanagement of the Fund and breaches of their fiduciary duties.

Separation of powers

Relying heavily on Hoag v. State, 04-0857 (La.12/1/04), 889 So.2d 1019, the City argues that it “cannot be judicially ordered to expend funds outside of the normal budgetary process” and that the trial court’s issuance of a mandamus violates the separation of powers doctrine. *421 This doctrine prohibits any one of the three branches of government from exercising power belonging to another branch. State v. Lanclos, 07-0082, pp. 10-11 (La.4/8/08), 980 So.2d 643, 651. In the instant matter, we find that the trial court’s judgment issuing a mandamus is not an improper exercise by the courts of a legislative function, as the City contends. In so finding, we distinguish this ease from Hoag and its progeny.
In Hoag, the plaintiffs, a group of coroners, sought past and future compensation pursuant to a statute enacted in 1984 which provided for coroners to receive an additional $548 per month from the State as supplemental pay. The [ 14State did not pay this additional compensation for ten years. In 2000, the plaintiffs filed suit and were granted a summary judgment awarding each coroner a certain amount owed under the statute.[14] Efforts were initiated in the legislature to appropriate funds to partially pay the judgment; however, the funds were never appropriated.[15] The coroners then filed another suit in 2003, seeking a writ of mandamus directing the legislature to appropriate the funds to pay the judgment. Thereafter, the trial court issued a mandamus, directing all legislators to appropriate the funds to pay the judgment.
In reversing the trial court, the Supreme Court, citing La. R.S. 13:5109(B),[16] recognized the settled jurisprudence that “judgment creditors cannot mandamus political subdivisions to appropriate funds for payment of a judgment rendered against the respective political subdivisions.” Id., 04-0857, p. 5, 889 So.2d at 1023. It then noted, as have we, that a writ of mandamus may only be issued where the actions sought to be performed “are purely ministerial in nature.” Id., 04-0857, p. 6, 889 So.2d at 1023. The Hoag court defined a ministerial duty as a “‘simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law.’ ” Id., 04-0857, p. 7, 889 So.2d at 1024. Finding that “[t]he very act of appropriating funds is, by its nature, discretionary and specifically granted to the legislature by the constitution,” the court held that “[although ... plaintiffs are entitled to payment of the judgment, a writ of mandamus directing the legislature 115to appropriate funds is an impermissible usurpation of legislative power by the judiciary.” Id., 04-0857, pp. 7-8, 889 So.2d at 1024-25.
It is clear that the Hoag decision was based largely on the constitutional grant to the legislature, under La. Const. art. III, § 16,[17] of the “sole authority ... to control *422 the funds of this state and to appropriate funds within its control.” Id., 04-0857, p. 8, 889 So.2d at 1024. It is this constitutional provision which supports the court’s finding that the act of appropriating funds is discretionary, which power is expressly reserved to the legislature.
In the instant matter, we have already determined that the City’s obligation to contribute to the Fund is a ministerial duty. As such, the trial court’s mandamus is not an improper usurpation of a legislative function and does not violate the separation of powers doctrine. Our affirmation of the trial court’s ruling is compatible with the Hoag decision. It is likewise consistent with our jurisprudence allowing the issuance of a mandamus against a political subdivision compelling it to comply with statutory duties that are ministerial in nature. See, e.g., Nicolay, supra. In so finding, we are guided by the Louisiana Supreme Court case of Carriere v. St. Landry Parish Police Jury, 97-1914 (La.3/4/98), 707 So.2d 979.
Camere involved a suit by a St. Landry Parish coroner for a writ of mandamus, compelling the Parish Police Jury to provide office space and pay his salary, health insurance and retirement benefits, and to fund the budget for the office’s annual operating expenses. The trial court issued a mandamus ordering the Police Jury to pay the coroner’s salary and budget for operating expenses. The Third Circuit affirmed the trial court’s judgment only insofar as it ordered the Police Jury to pay the “necessary or unavoidable” operational expenses. Id., 97-1914, (La.3/4/98), 707 So.2d at 981. The judgment as to other sums awarded was reversed.
The Supreme Court granted writs to consider, among other issues, whether the payment of coroner salaries by the parish governing bodies is statutorily mandated obligation or one arising from constitutional provisions. The Carriere court did not expressly address the issue of the separation of powers between the judiciary and the legislature; however, the court observed that “[ojnce the legislature places the burden of paying salaries or other expenses of a state official on parish governing authorities, those bodies are generally obligated to pay these mandated expenses.” Id., 707 So.2d at 981 (citing Reed v. Washington Parish Police Jury, 518 So.2d 1044, 1049 (La.1988)). (Emphasis added). The court reasoned:
Prior to a 1991 constitutional amendment, it was not uncommon for the legislature to impose mandatory duties on parish governing bodies that required the appropriation of funds without providing a corresponding funding source. However, it is beyond our powers to act in a similar fashion and place responsibility 117for funding state officials on parishes unless there already exists a clear legislative mandate to do so.
Id., 707 So.2d at 981-82. (Emphasis added).
The Supreme Court later reiterated these principles in Perron v. Evangeline Parish Police Jury, 01-0603 (La.10/16/01), 798 So.2d 67, also a mandamus action by a parish coroner seeking to compel the parish police jury to fund his office. The trial court rendered judgment in favor of the coroner, including an award for attorney’s *423 fees. The court of appeal reversed and the Supreme Court granted writs to consider whether attorney’s fees may be awarded in connection with the mandamus proceeding.[18] The court, addressing the separation of powers issue, stated:
Under the particular facts of this case, we do not find that an order directing the police jury to appropriate funds for the coroner’s attorney fee expenses violates the doctrine of separation of powers. In concluding that it was prohibited from awarding attorney fee expenses to plaintiff, the court of appeal cited Gongre v. Mayor and Bd. of Aldermen of Town of Montgomery, 98-677 (La.App. 3d Cir.10/28/98), 721 So.2d 968, writ denied, 98-2954 (La.1/29/99), 736 So.2d 834, and Landry v. City of Erath, 628 So.2d 1178 (La.App. 3d Cir.1993), writ denied, 94-0275 (La.3/25/94), 635 So.2d 235, each of these cases finding a violation of the separation of powers doctrine when a court orders a governing body to appropriate money when there is no statutory duty to do so. In Carriere, 707 So.2d at 982, this court did recognize the separation of powers principle, which limits a court’s power to place the responsibility of funding state officials on parishes unless a clear legislative mandate exists compelling such funding. While cognizant of this principle, we nonetheless conclude that the legislature has determined that attorney fee expenses incurred by the coroner’s office, so long as they are “necessary or unavoidable expenses ... incident to the operation and functioning of the coroner’s office,” | isare payable by the parish police jury. La.Rev.Stat. 33:1556(B)(1). In finding that the legislature has mandated the parish to pay these expenses, we are simply interpreting and enforcing this statute, not legislating a judicial solution. Thus, we discern no violation of the doctrine of separation of powers.
Id., 01-0603, pp. 9-10, 798 So.2d at 73.
In Parish of St. Charles v. R.H. Creager, Inc., 10-180 (La.App. 5 Cir. 12/14/10), 55 So.3d 884, writ denied, 11-0118 (La.4/1/11), 60 So.3d 1250, after their property was expropriated by the Parish of St. Charles, the plaintiffs contested the Parish’s valuation of the property and obtained a judgment against the Parish. When the Parish failed to pay the judgment, the plaintiffs sought and obtained writ of mandamus compelling the Parish authorities to “cause payment of the amount awarded in the final, definitive judgment.” Id., 10-180, p. 4, 55 So.2d at 884. While mandamus was noted to be specifically authorized by La. R.S. 38:390(A) as a procedure by which to collect the amount awarded in excess of that deposited by an expropriating authority, the Fifth Circuit also considered the Parish’s argument that “the judiciary is without authority to issue a writ of mandamus in any matter to enforce a money judgment ... unless the money for payment of the judgment has been specifically allocated.” Id., 10-180, p. 11, 55 So.2d at 881.
Rejecting that argument, the Fifth Circuit stated:
We recognize that the Louisiana constitution establishes a separation of powers among the three branches of government. ... However, a mandamus will lie against the State when the duty to be compelled is purely ministerial and not discretionary. We find the wording of the expropriation laws and the constitu *424 tion set forth by the legislature make payment of fair and just compensation mandatory and not discretionary. Accordingly, we find the judiciary has the constitutional authority to issue a mandamus in this matter if warranted.
Id., 10-180, p. 13, 55 So.2d at 892.
With this background, we conclude, as did the Perron court, that “a clear legislative mandate exists” which requires the City to pay into the Fund the “accrued liability contribution” under La. R.S. 11:3384(F). While we recognize that our constitution provides, under Article VI, § 14(A)(1) that “[n]o law or state executive order, rule, or regulation requiring increased expenditures for any purpose shall become effective within a political subdivision until approved by ordinance enacted, or resolution adopted, by the governing authority of the affected political subdivision ...,”[19] it specifically exempts “[a] law providing for civil service, minimum wages, hours, working conditions, and pension and retirement benefits, or vacation or sick leave benefits for firemen and municipal policemen.” La. Const. art. VI, § 14(A)(1)(e). (Emphasis added).
Furthermore, by enacting La. R.S. 11:3361 and La. R.S. 11:3384(F), the legislature placed the responsibility on the City of paying into the Fund which we conclude is a “clear legislative mandate ... compelling such funding.” See: Perron, supra, 01-0603, pp. 9-10, 798 So.2d at 73. As did the Perron and Carriere courts, we find no violation of the separation of powers doctrine in compelling the City to contribute to the Fund by way of mandamus. We find that, because “the legislature has mandated the [City] to pay [into the Fund], we are simply interpreting and enforcing this statute, not legislating a judicial solution.” See: Perron, 01-0603, p. 10, 798 So.2d at 73. To hold otherwise would allow the City to altogether disregard its mandatory statutory funding obligations with the protection of the courts, under the guise that a court issued mandamus ordering such payment violates the separation of powers doctrine. Such a result would render meaningless both the statutory scheme for the Fund and the legislatively mandated mechanism for its funding.

Effect on the City’s 2012 budget

The City’s next argument is that the trial court’s judgment has the effect of retroactively destabilizing the City’s balanced budget for 2012. It maintains that the City’s Home Rule Charter, which requires that the City annually balance its budget, prohibits any amendment which “increasefs] the aggregate of authorized expenditures to an amount greater than the estimate of revenues for the year.”[20] The City also contends that the Charter does not allow its finance department to “approve any expenditure under any portion of an annual operating budget ordinance until sufficient estimated revenues *425 have been provided to finance the proposed expenditures.”[21]
The City further argues that the trial court’s mandamus violates the Louisiana Local Government Budget Act (“LLGBA”), citing La. R.S. 39:1310(A), which states, in part, that “[i]n no event shall a budget amendment be adopted proposing expenditures which exceed the total of estimated funds available for the fiscal year.” Finally, the City argues that La. C.C. Pr. art. 3862 prohibits the issuance of mandamus against a state agency when “the expenditure of such funds would have the effect of creating a deficit in the funds of said agency....”
121 We recognize that the Louisiana Constitution grants municipalities the power to set up home rule charters,[22] and permits a municipality’s home rule charter to “provide the structure and organization, powers, and functions of the government of the local governmental subdivision, which may include the exercise of any power and performance of any function necessary, requisite, or proper for the management of its affairs, not denied by general law or inconsistent with this constitution.”[23] We also recognize that “[p]ursuant to Article VI of the Louisiana Constitution, a municipal authority governed by a home rule charter possesses powers, in affairs of local concern within its jurisdiction, that are as broad as those of the state, except when limited by the constitution, laws permitted by the constitution or its own home rule charter.” Fransen v. City of New Orleans, 08-0076, p. 10 (La.7/1/08), 988 So.2d 225, 234, citing La. Const. art. VI, §§ 4-5; Civil Serv. Comm’n of the City of New Orleans v. The City of New Orleans, 02-1812, p. 4 (La.9/9/03), 854 So.2d 322, 326.
We note, too, that La. R.S. 39:1310(A) does provide, as the City indicated, that a budget amendment is not to be adopted that proposes expenditures that exceed the total of estimated funds for a given year. However, the City seems to suggest that, because of this provision, it can never be ordered to pay any sums which have not been included in its budget for any given year. A full reading of La. R.S. 39:1310(A) reflects that amendments are permitted when “there has been a change in operations upon which the original adopted budget was developed.” Id.[24] There is little jurisprudence addressing what is meant by a “change in operations.” The First Circuit, in Tardo v. Lafourche Parish Council, 476 So.2d 997, 1003 (La.App. 1 Cir.1985), declined to find a change in economic circumstances to be such a “change in operations,” instead suggesting “such things as curtailing, eliminating or adding a particular service for the people would meet the criteria, as well as adopting additional revenue producing measures to permit the enhancement of services for the people.” We, too, will not attempt to define what constitutes a “change in operations.” We simply find that amendments to the budget are permissible and neither the Home Rule Charter nor La. R.S. 39:1310(A) prohibit the trial court from issuing a mandamus compelling the City to comply with its statutory obligations under La. R.S. 11:3384(F). We likewise find the City’s reliance on La. C.C. Pr. art. 3862 to be misplaced.
*426 We are guided, as was the trial court, by the case of Penny v. Bowden, 199 So.2d 345 (La.App. 3 Cir.1967), a case filed by retired policemen seeking to have a mandamus issued to the City of Alexandria to appropriate annually to their pension fund any deficit in that fund, as required by statute (then La. R.S. R.S. 33:2222). In rejecting the City’s argument that it had “no funds with which to comply with a judgment directing it to appropriate monies into the requirement fund,” the Court stated:
... [T]he duty to appropriate and pay any yearly deficit which occurs in the operation of the policemen’s retirement fund is a statutory duty imposed by the will of the Legislature on the municipality. Our system of local government contemplates that statutory charges imposed on a municipality by the Legislature take precedence over a more permissive use of municipal funds, and it is settled that the State has the power to require a municipality to set up and appropriate money to a pension system ... We are of the opinion, therefore, that though in the City Council’s view the Council might better serve the inhabitants of the city by allocating the proceeds from the ad valorem tax to other functions, the | gowill of the Legislature in this regard is supre [sic] and must be obeyed.
Id., 199 So.2d at 350-51.
We agree with the Penny court and find that, in this matter, the duty to pay into the Fund is statutorily imposed. As such, we find no merit in the City’s contention that the mandamus is unlawful insofar as it has the effect of “destabilizing” the “balanced budget.”

Evidence of the Trustees’ mismanagement of the Fund

The City’s final argument is that the trial court erred in excluding evidence of the Trustees’ mismanagement of the Fund and their breaches of their fiduciary duties at trial. It maintains that, because it was unable to develop its affirmative defenses, it was “unfairly prejudice[d]” at trial.[25] We disagree and find no error in the trial court’s ruling as the evidence sought to be introduced by the City is not relevant to the issues in this matter. Relevant evidence is “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” La. C.E. art. 401.
The issues in this matter center on the City’s obligations under La. R.S. 11:3384(F). The statute clearly and simply provides that the City is to pay both the “normal contribution” and the “accrued liability contribution.” Nowhere in the statute, or any other statute, is there a mechanism for offsetting the amount actu-arially determined to be owed by he City. Likewise, the statute makes no reference to any considerations to be taken into account in determining what the City owes.[26] As we noted previously, as a judiciary, our task is to interpret the law, as enacted by the legislature. See, e.g., Unwired Telecom Corp. v. Parish of Calcasieu, 03-0732 (La.1/19/05), 903 So.2d 392, 404. (“interpreting the law is the designated function of the judiciary, not the Legislature”). Conversely, it is strictly within the legislature’s province to write the laws. See, e.g., CLK Company, L.L.C. v. CXY *427 Energy Inc., 98-0802 (La.App. 4 Cir. 9/16/98), 719 So.2d 1098, 1109. We cannot interpret the statutes to include a consideration of the manner in which the Fund has been handled as a factor in determining the amount the City owes, as doing so would effectively rewrite the laws.
Thus, we conclude that the alleged mismanagement of the Fund or breaches of the Trustees’ fiduciary duties are not relevant to the issue of the City’s mandatory contributions to the Fund. The trial court properly excluded this evidence.
CONCLUSION
For the reasons discussed herein, the trial court’s judgment is affirmed.
AFFIRMED.

. Named as defendants are the City of New Orleans, Mayor Mitchell J. Landrieu, the City’s CFO, Norman Foster, and members of the City Council (Jacquelyn Brechtel Clark-son, Stacy Head, Susan G. Guidry, Diana Bajoie, Kristin Gisleson Palmer and Cynthia Hedge-Morrell). The defendants will collectively be referred to as "the City.” We note that the trial court's judgment does not include Diana Bajoie as a member of the City Council and adds Latoya Cantrell and James Gray as members of the Council, although no amending Petition was filed for the substitution of those parties.

. That statute provides, in pertinent part, that the Board of Trustees for the Fund "shall employ an actuary who shall annually certify to the board the amount of contributions required from the city and other sources to maintain the system on an actuarial basis.” La. R.S. 11:3363(D).

. This was the projected amount for the year 2012; the Petition was filed prior to the year’s end, in July, 2012.

. The sum of $17,524,359 is the amount by which the Petition alleges the Fund was to be underfunded for the year ending in December, 2012. It is unclear why the Petition sought the immediate payment of only the amount allegedly owed in 2012 and not the amounts by which the Fund was also allegedly underfunded in 2011 or 2010.

. Defendants alleged mismanagement in a number of ways, including: (1) relying on "ill-advised investment advice;” (2) authorizing speculative loans to private entities; (3) failing to properly investigate the credit worthiness of its borrowers "in whom they chose to invest the assets of the Fund;” (5) failing to "undertake proper due diligence in the investigating of the liquidity promised by the FIA Leveraged Fund;” and (6) overinvesting in real estate.

. New Orleans Fire Fighters Pension and Relief Fund v. City of New Orleans, 13-C-0025, unpub. (La.App.4.Cir.1/8/13). The record before us is incomplete and does not contain a copy of the writ application; only a copy of the writ disposition is included.

. The record before us reflects that a pre-trial conference was held on May 20, 2013, following which a Trial Order was issued setting a jury trial on defendants' Reconventional Demand, to begin on March 17, 2014.

. Indeed, the City contributed $9 million to the Fund for the fiscal year 2012. This amount represents approximately 10% of the Fire Department budget, which for 2012 was $87.55 million. La. R.S. 11:3361 only requires that the City pay "not less than five percent.” We note that the City contributed ten percent, rather than five percent; however, the statute only prescribes the minimum contribution required by the City. It does not negate the City’s other statutory obligations.

. This Court explained the function of the actuary in Palisi v. New Orleans Fire Department, 95-1455 (La.App. 4 Cir. 3/12/97), 690 So.2d 1018, 1041-1042:
Where an actuarially determined defined benefit plan is involved, only overall funding proportions have any meaning. Such plans are funded on an overall basis, i.e., the pool as a whole is funded ... An actuary tries to project the needs of the group as a whole ... The projections are modified every time a new contribution amount is determined in order to take into account the amount by which actual plan experience varied from the previous projection. Some firemen may retire early, some late, some will be disabled, some will quit, some will be terminated and some new ones will be hired, and some years the plan investments will perform either better or worse than projected. All of these deviations affect pool funding. As even the most skilled actuary does not have a crystal ball such deviations from projections are absolutely certain to occur.

. See: La. R.S. 11:3363(D).

. Mr. Conefry described an actuary as "a mathematician who specializes in life insurance and related Helds, such as employee benefits and casualty insurance.” His spe *418 cialties are “employee benefits in general, and defined benefit and defined contribution pension plans.”

. According to Mr. Conefry, this method is "generally accepted both by actuaries and by regulators at the state and national levels in establishing regulations and guidelines for defined benefit pension plan funding.”

. Because of our finding that mandamus was proper, the City's contention that the trial court erred in denying its Dilatory Exception of Improper Use of Summary Proceedings is moot. Similarly, we find no error in the trial court’s denial of the City’s Peremptory Exception of No Cause of Action. That exception questions whether the law extends a remedy to anyone under the factual allegations of the petition. Fink v. Bryant, 01-0987, p. 3 (La.11/28/01), 801 So.2d 346, 348. The City maintains that its exception should have been granted because the statutes "do not establish [the Fund’s] clear entitlement to relief” and "do not impose any obligations that may be enforced through a writ of mandamus.” Having determined that the statutes do clearly require the City to make the required contributions, the trial court properly denied the City’s exception.

. The summary judgment was appealed and affirmed by the First Circuit. The Supreme Court denied writs.

. A similar suit had been filed in 1996 by several coroners, which resulted in a judgment for which the legislature appropriated funds and made payment on the judgment.

. La. R.S. 13:5109(B)(2) provides, in pertinent part, that “[a]ny judgment rendered in any suit filed against the state, a state agency, or a political subdivision, or any compromise reached in favor of the plaintiff or plaintiffs in any such suit shall be exigible, payable, and paid only out of funds appropriated for that purpose by the legislature, if the suit was filed against the state or a state agency, or out of funds appropriated for that purpose by the named political subdivision, if the suit was filed against a political subdivision."

. La. Const. art. III, § 16 provides, in pertinent part:
(A) Specific Appropriation for One Year. Except as otherwise provided by this constitution, no money shall be withdrawn from the state treasury except through specific appropriation, and no appropriation shall be made under the heading of contingencies or for longer than one year.
(B) Origin in House of Representatives. All bills for raising revenue or appropriating money shall originate in the House of Representatives, but the Senate may pro *422 pose or concur in amendments, as in other bills.
(C) General Appropriation Bill; Limitations. The general appropriation bill shall be itemized and shall contain only appropriations for the ordinary operating expenses of government, public charities, pensions, and the public debt or interest thereon.
(D) Specific Purpose and Amount. All other bills for appropriating money shall be for a specific purpose and amount.

. The issue centered on whether La. R.S. 33:1556(B)(1) (amended and redesignated as La. R.S. 33:5707(B)(1)) which provides that the coroner shall receive “[a]ll necessary or unavoidable expenses," included an award for attorney’s fees expended in the mandamus action.

. The full text of that article is as follows:
(A)(1) No law or state executive order, rule, or regulation requiring increased expenditures for any purpose shall become effective within a political subdivision until approved by ordinance enacted, or resolution adopted, by the governing authority of the affected political subdivision or until, and only as long as, the legislature appropriates funds for the purpose to the affected political subdivision and only to the extent and amount that such funds are provided, or until a law provides for a local source of revenue within the political subdivision for the purpose and the affected political subdi- ■ vision is authorized by ordinance or resolution to levy and collect such revenue and only to the extent and amount of such revenue. This Paragraph shall not apply to a school board.

. New Orleans Home Rule Charter Art. III, § 3-115(3).

. New Orleans Home Rule Charter Art. III, § 3-116(2).

. La. Const, art. VI § 5(A)

. La. Const, art. VI, § 5(E)

. The New Orleans Home Rule Charter authorizes amendments as well. Section 3-115(3) states that “[a]mendments to the annual operating budget ordinance shall be considered and approved by the Council under the same procedures prescribed for its original adoption....”

. As previously noted, the City filed a writ of supervisory review with this Court after the trial court ruled the evidence inadmissible and the writ was denied.

. Presumably, the Fund is evaluated by the actuary, whose calculations, as Mr. Conefry indicated, include the Fund’s overall performance.